

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-2001

# Chisolm v. Manimon

Precedential or Non-Precedential:

Docket 00-1865

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation
"Chisolm v. Manimon" (2001). *2001 Decisions.* Paper 302.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/302

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 28, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1865

RONALD CHISOLM

     Appellant

v.

PATRICK MCMANIMON, JR., DIRECTOR OF MERCER
COUNTY DETENTION CENTER;
MERCER COUNTY COURT,
     Appellees

UNITED STATES OF AMERICA,
     Intervenor

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 95-cv-00991)
District Judge: Honorable Mary Little Cooper

Argued on July 24, 2001

Before: ROTH, BARRY and AMBRO, Circuit Judges

(Opinion filed December 28, 2001)

       Clara R. Smit, Esquire
       Turnpike Metroplex
       190 Highway 18 North, Suite 200
       East Brunswick, NJ 08816

Marc Charmatz, Esquire
Mary Vargas, Esquire (Argued)
Sarah Geer, Esquire
Claudia Gordon, Esquire
National Association of the
 Deaf Law Center
814 Thayer Avenue
Silver Spring, MD 20910

 Attorneys for Appellant

Andrew J. Schragger, Esquire
Ashley Bostic-Hutchinson, Esquire
 (Argued)
Office of County Counsel,
 County of Mercer
640 South Broad Street
McDade Administration Building
Trenton, NJ 08650

Doulgass L. Derry, Esquire (Argued)
Office of Attorney General of
 New Jersey
Department of Law & Public Safety
Richard J. Hughes Justice Complex
Trenton, NJ 08625

John J. Farmer, Jr.
 Attorney General of New Jersey
Nancy Kaplen
 Assistant Attorney General
Diane M. Lamb
 Deputy Attorney General
Office of Attorney General of
 New Jersey
25 Market Street
Trenton, NJ 08625

 Attorneys for Appellees

Seth M. Galanter, Esquire
United States Department of Justice
Civil Rights Division
P.O. Box 66078
Washington, DC 20035-6078

 Attorney for Intervenor

OPINION OF THE COURT

ROTH, Circuit Judge:

In this appeal, we must resolve two issues. First, we consider whether the Eleventh Amendment bars suit against a county court, based on an alleged failure to provide interpretive services, where the judicial, but not all the administrative, functions of the court have been merged by steps into a unified state court system. Under the facts here, we hold that suit is not barred. Second, we review whether the District Court properly granted summary judgment, dismissing claims brought by a disabled inmate under Title II of the Americans with Disabilities Act, 42 U.S.C. SS 12131-12135 ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. S 794 ("Rehabilitation Act"), 42 U.S.C. S 1983 and the New Jersey Law Against Discrimination, N.J. Stat. S 10:5-4.1 (NJLAD). Because we conclude that there are genuine issues of material fact, we will reverse the granting of summary judgment by the District Court and remand this case for further proceedings consistent with this opinion.

I. Factual and Procedural History

A. Ronald Chisolm's Detention at the Mercer County
      Detention Center

On Saturday, September 10, 1994, while driving in Mercer County, New Jersey, Ronald Chisolm, a deaf person who communicates primarily through American Sign Language (ASL), was stopped by officers of the Princeton Police Department. The officers arrested Chisolm pursuant to a Bucks County, Pennsylvania, bench warrant. The

3

bench warrant was issued in 1990 because Chisolm failed to attend an intoxicated driver resource program. The program was required as part of his sentence following a 1987 guilty plea to driving under the influence. After Chisolm's arrest, he was taken to the Mercer County Detention Center (MCDC) to await extradition to Bucks County. He was admitted to MCDC at 3:40 p.m on Saturday afternoon.

MCDC, which has since closed, was a maximum security, pretrial detention facility located in Trenton, New Jersey. It housed detainees who were awaiting extradition to other states or were awaiting trial on indictable charges, ranging from murder to narcotics-related offenses. When inmates arrived at MCDC during the week, they were generally processed within a few hours. Processing occurred at the intake unit (4 North Living Unit) and involved a classification assessment to determine the inmate's security threat, custody status, and appropriate placement within MCDC. However, the MCDC's classification staff worked only Monday through Friday. On weekends, newly arrived detainees were "locked-down" in their cells either in the 4 North Living Unit or in the Receiving and Discharge Unit (R&D) to keep them apart from the general inmate population before classification. These unclassified detainees consumed their meals in their cells and did not have television or telephone privileges.

When Chisolm arrived at MCDC on Saturday afternoon, an MCDC employee attempted to interview him. Chisolm indicated to the employee that he was deaf and could not understand her. Chisolm then requested an ASL interpreter and a TDD.[1] In addition, he asked that his hearing roommate, Kenneth Knight, be contacted. Chisolm contends that MCDC failed to provide the requested aids and failed to contact Knight. He also claims that MCDC did not provide him with any initial intake information, such as

_____

1. A TDD is a machine that allows those with hearing disabilities to communicate with others by telephone. The TDD translates spoken words into written text for the deaf user. The deaf user then responds by typing his message into the TDD which transforms the typed message into spoken words.

4

the reason for his detention or the rules and regulations of the facility.

Later that afternoon, Chisolm was taken to an MCDC nurse. Chisolm claims that he was upset, but, without an ASL interpreter, he could not explain why he was upset. MCDC asserts, however, that Chisolm was given paper and a pencil in order to communicate with MCDC personnel. The MCDC nurse conducted a medical evaluation of Chisolm and determined that he might be a suicide risk. MCDC contends that Chisolm's behavior caused concern that he might harm himself.

Chisolm was kept in solitary lock down in cell 304 of R&D from Saturday, September 10, until Tuesday, September 13. During this time, he did not have access to a television set because there wasn't one in R&D. Moreover, pursuant to MCDC policies, Chisolm could not have access to a telephone until he was classified.

On Monday, September 12, Chisolm was taken to penal counselor Jennifer Rubin for custody classification. Rubin gave him a numeric assessment of 10, which resulted in a custody classification of "medium."[2] Notwithstanding the fact that Chisolm had worked for the U.S. Postal Service for 13 years and had lived at the same address for 3 years, Rubin described him as an unemployed "vagrant." This error added 2 points to Chisolm's assessment, resulting in his medium custody classification. Without this error, Chisolm's custody classification would have been "minimum."

Also on the morning of September 12, Warden McManimon informed another penal counselor, Donna

_____

2. In processing and classifying Chisolm pursuant to MCDC policies, Rubin reviewed the following factors used to determine an inmate's custody status: 1) severity of the current offense; 2) assaultive offense history; 3) history of institutional violence; 4) any assaults occurring within the six months preceding detention; 5) disciplinary reports; 6) current detainer; 7) amount of bail; 8) inmate's sentence; 9) stability factor; and 10) inmate's employment status. For male inmates, a numeric assessment of 15 or more points resulted in maximum custody classification; 10-14 points resulted in medium custody classification; and 9 points or less resulted in minimum custody classification.

Walker, that a hearing impaired inmate had been admitted. Walker attempted to communicate with Chisolm through lip reading and writing notes. Chisolm asked Walker to contact Knight and again requested a TDD. Although MCDC did not have a TDD, Walker did contact Knight who brought Chisolm's own TDD to MCDC that same day. MCDC, however, had to log in and examine the TDD before releasing it to Chisolm. For that reason, Chisolm did not receive it until Tuesday, September 13. Because of his hearing disability and the failure of MCDC to provide him with a TDD, Chisolm was not able to use a telephone on Monday, September 12.

On September 13, Chisolm was transferred to cell 24 of 4 North Living Unit, where he remained until his discharge the next day. This unit had a television set equipped with closed captioning. Warden McManimon stated that if Chisolm wanted to have the closed captioning activated, Chisolm only needed to request the service. Chisolm contends, however, that he did not request closed captioning because he did not know that it was available. While in 4 North Living Unit, Chisolm was able to place telephone calls using his own TDD. MCDC did not impose its time limit of 15 minutes for telephone use on Chisolm because of the additional time necessary to type and read text on the TDD.

B. Chisolm's Appearance Before the Mercer County
       Vicinage

On September 14, 1994, Chisolm was brought before the Mercer County Vicinage for an extradition hearing. There was no ASL interpreter present to aid Chisolm. For this reason, the judge postponed the extradition hearing and sent Chisolm back to MCDC. The hearing was rescheduled for September 20, which was the earliest date that the Vicinage's ASL interpreter was available. After his return to MCDC, Chisolm called Knight by TDD. Knight contacted an attorney, Clara Smit.

Smit arranged to have an ASL interpreter available the next morning to interpret court proceedings. Smit also contacted the Bucks County District Attorney's office and had Chisolm's bench warrant quashed. Chisolm was then

released from MCDC that same day, and the court hearing was canceled. The parties agree that, but for the intervention by Smit, Chisolm's hearing would have been rescheduled for September 20.

C. Relevant History of the Vicinage[3]

The Vicinage originally was organized as one of many locally-funded county courts authorized under Article IV of the New Jersey Constitution. See N.J. Const. art.VI, S 4, P 1-5 (amended 1978). However, pursuant to constitutional amendments passed in 1978, 1983 and 1992, the Vicinage and other county courts have been merged gradually into New Jersey's state-based Superior Court system. See N.J. Assembly Concurrent Resolution No. 38 (filed July 25, 1978) (abolishing county courts); N.J. Assembly Concurrent Resolution No. 84 (filed Feb. 10, 1983) (authorizing the transition by which county court judges became New Jersey Superior Court Judges without nomination or confirmation); N.J. Senate Concurrent Resolution No. 58, 1992 N.J. Sess. Law Serv. A-3 (West) (setting forth plan by which New Jersey became responsible for certain judicial costs and fees, and county judicial employees became employees of the State, on or before July 1, 1997).

In connection with the transition from a county court system to a state court system and in order to implement the 1992 Amendment, the New Jersey legislature enacted the State Judicial Unification Act, N. J. Stat.SS 2B:10-1 to 2B:10-9 (2001) (SJUA). Pursuant to the SJUA, the State of New Jersey assumed certain judicial costs and related liabilities of the Vicinage. See N.J. Stat.S 2B:10-7 (2001). Significantly, however, the Vicinage retained liability for "any tort claim . . . where the date of loss was prior to January 1, 1995." Id. at 2B:10-7(c)(2). Additionally, a New Jersey statute requires individual counties to provide

_____

3. A history of the incorporation of New Jersey's county courts into its unified state court system is set forth in Board of Chosen Freeholders v. New Jersey, 732 A.2d 1053 (N.J. 1999). We will recite only that portion of this history relevant to our analysis of the sovereign immunity of the Vicinage.

7

necessary interpreting services for the hearing impaired in court proceedings. See id. at 2B:8-1.4

D. Procedural History

On March 6, 1995, Chisolm filed a complaint in United States District Court for the District of New Jersey against McManimon in his capacity as Warden of MCDC and against the Vicinage. He alleged that MCDC discriminated against him, while he was detained, by failing to provide him with an ASL interpreter, a TDD, and television captioning service, in violation of Title II of the ADA, Section 504 of the Rehabilitation Act, 42 U.S.C. S 1983, and the NJLAD. He alleged that the Vicinage discriminated against him by failing to provide him with an ASL interpreter for his extradition hearing, when initially scheduled, in violation of the same statutes. Chisolm sought compensatory and punitive damages.

On June 11, 1997, the District Court granted summary judgment in favor of the Vicinage on Chisolm's ADA, Rehabilitation Act, and 42 U.S.C. S 1983 claims, and dismissed the NJLAD claim for lack of subject matter jurisdiction. See Chisolm v. Manimon, Civ. No. 95-0991 (D. N.J. filed Jun. 11, 1997).5 The District Court held that Chisolm's ADA and Rehabilitation Act claims must fail because he was never excluded from a program by reason of his disability, i.e., his extradition hearing never occurred.

The District Court also raised sua sponte the issue of the Vicinage's sovereign immunity under the Eleventh Amendment to the United States Constitution. Finding that Congress validly abrogated the states' Eleventh Amendment immunity in enacting Title II of the ADA, the District Court

_____

4. After the judicial unification, Section 2B:8-1 was amended to clarify that "interpreting services" included interpreters for the hearing impaired. See 1995 N.J. Laws c. 98, S 1 (effective May 9, 1995). The statute does not, however, require the state to pay for these services. See id. Significantly, responsibility for providing interpreters was kept with the counties. See N.J. Stat. S 2B:8-1 (2001).

5. The case was captioned improperly as "Ronald Chisolm v. Patrick Manimon, Jr." In this opinion, we use the proper spelling of the warden's name, "McManimon."

ruled that the Vicinage was not immune from Chisolm's
suit.

On May 18, 2000, the District Court granted summary
judgment for MCDC (McManimon in his official capacity) on
Chisolm's ADA, Rehabilitation Act and NJLAD claims and
dismissed all of Chisolm's claims.6 Chisolm v. Manimon, 97
F.Supp.2d 615 (D. N.J. 2000). The court concluded that
"any rational trier of fact would find that reasonable
accommodations were provided to Chisolm by defendant,
and that any requested accommodations which were not
provided . . . would not have been reasonable in the setting
of a correctional institution." Id.

Chisolm timely appealed.

II Jurisdiction and Standard of Review

The District Court had jurisdiction over this case
pursuant to 28 U.S.C. S 1331. We have jurisdiction
pursuant to 28 U.S.C. S 1291.

We exercise plenary review over the grant of summary
judgment, applying the same standard that the lower court
should have applied. See Farrell v. Planters Lifesavers Co.,
206 F.3d 271, 278 (3d Cir. 2000). Summary judgment is
appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts
are "material" if they could affect the outcome of the suit
under the governing substantive law. Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986). We must view the facts in the light most
favorable to the non-moving party, see Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106
S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw"all
justifiable inferences in [its] favor." Anderson, 477 U.S. at
255.

_____

6. The court also granted summary judgment in favor of MCDC on
Chisolm's Section 1983 claim, finding no facts supporting a procedural
due process claim.

III. Discussion

A. Sovereign Immunity of the Vicinage

Before turning to the merits of Chisolm's claims against MCDC and the Vicinage, we must address whether, under the Eleventh Amendment to the U.S. Constitution, the Vicinage is immune from Chisolm's suit. Having raised the issue sua sponte, the District Court held that the Vicinage did not enjoy Eleventh Amendment sovereign immunity. Although we reach the same conclusion as the District Court, we do so for different reasons.7  Specifically, we hold that the Vicinage cannot assert sovereign immunity in this case because at the time of the actions giving rise to this suit and at the time this suit was brought, the Vicinage did not qualify as an entity that is an arm of the state. So holding, we need not address (1) whether the Vicinage waived the immunity defense by its conduct in litigation or (2) whether Congress validly abrogated Eleventh Amendment immunity when enacting Title II of the ADA.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be
> construed to extend to any suit in law or equity,

_____

7. The District Court concluded that Congress had abrogated Eleventh Amendment immunity with respect to suits arising out of the ADA and the Rehabilitation Act. See id. at 4–10. See also Seminole Tribe of Florida
v. Florida, 517 U.S. 44, 55 (1996) (setting forth the test by which a court
must determine whether Congress has abrogated the states' sovereign immunity from suit).

After the District Court decided the immunity issue, the United States Supreme Court held that Congress did not abrogate the states' sovereign immunity by enacting Title I of the ADA in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001); see also Lavia v. Pennsylvania Dept. of Corrections, 224 F.3d 190 (3d Cir. 2000) (holding that Congress did not validly abrogate states' Eleventh Amendment sovereign immunity from suit under ADA's Title I). Significantly, however, the Garrett Court did not address whether Congress abrogated Eleventh Amendment immunity in the context of suits brought under Title II of the ADA. See id. at 960 n.1 (noting a split among the Courts of Appeals on this issue but declining to resolve the split without the benefit of briefing). Accordingly, the District Court's opinion is not invalidated expressly by Garrett.

10

      commenced or prosecuted against one of the United
      States by Citizens of another State, or by Citizens or
      Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has interpreted the Eleventh Amendment to provide each state with immunity not only from suits brought by citizens of other states, but also from suits brought by its own citizens. See, e.g., Hans v. Louisiana, 134 U.S. 1 (1890).

While Eleventh Amendment immunity may be available for states, its protections do not extend to counties. See Lincoln County v. Luning, 133 U.S. 529 (1890). Rather, for Eleventh Amendment immunity to apply, a court must determine that a state is a real party-in-interest. See, e.g., Ford Motor Co. v. Department of Treasury of Indiana , 323 U.S. 459, 464 (1945). Accordingly, Eleventh Amendment immunity will not be available to a state merely by virtue of the fact that such state is named formally as a defendant. See, e.g., Ex parte New York, 256 U.S. 490, 500 (1921) ("As to what is to be deemed a suit against a State, . . . it is now established that the question is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record."). Conversely, Eleventh Amendment immunity may be available to a state party-in-interest notwithstanding a claimant's failure to formally name the state as a defendant. See, e.g., Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690 (1978); Ford Motor, 323 U.S. at 464.

In determining whether an entity is an arm of the state and, therefore, entitled to Eleventh Amendment immunity, we consider the following three factors: (1) whether payment of a judgment resulting from the suit would come from the state treasury, (2) the status of the entity under state law, and (3) the entity's degree of autonomy. See Fitchik v. New Jersey Transit Rail Operations, Inc. , 873 F.2d 655, 659 (3d Cir. 1989) (en banc). A party asserting Eleventh Amendment immunity bears the burden of proving its applicability. See Christy v. Pennsylvania Turnpike Comm'n, 54 F.3d 1140, 1144 (3d Cir. 1995). Although no single factor is dispositive, we have often held that the most important factor is whether a judgment

11

resulting from the suit would be paid from the state treasury. See, e.g., Carter v. City of Philadelphia, 181 F.3d 339 (3d Cir. 1999); Christy, 54 F. 3d at 1140; Fitchik, 873 F.2d at 659-660. We conclude that the Vicinage has not met its burden of demonstrating entitlement to Eleventh Amendment immunity. Specifically, the Vicinage has not proved that it is an arm of the state under the Fitchik factors.

Application of the Fitchik factors to the Vicinage must be viewed in the context of the unification of the New Jersey court system. The events giving rise to Chisolm's suit against the Vicinage, as well as the filing of the suit itself, transpired during the Vicinage's transition from a county court to a state court. The extent to which the Vicinage may be considered an arm of the state -- as opposed to a county entity -- is complicated by this transition. We conclude that under the circumstances of this case, the Vicinage was not acting as an "arm of the state" under Fitchik.8

Section 2B:10-7(c)(2) of the SJUA directly addresses the first of the three Fitchik factors: whether a judgment would be paid out of the state treasury. Chisolm's claims against the Vicinage, brought in March 1995 as a result of the alleged discrimination during September 1994, clearly were tort claims for which the date of loss pre-dated January 1, 1995. Section 2B:10-7(c)(2) expressly provides that, even after the transition of the Vicinage to a state court, any such claims were the liabilities of Mercer County. Because Mercer County -- and not the State of New Jersey-- would satisfy any judgment entered for Chisolm, the "funding factor" weighs heavily against the Vicinage's assertion of sovereign immunity.

With respect to the second Fitchik factor, status under
_____

8. The Vicinage's transition from a county entity to a state entity raises another interesting question: At what time must a defendant be an "arm of the state" in order to be eligible for Eleventh Amendment immunity? Should we apply the Fitchik factors to the Vicinage as of the time of Chisolm's alleged injury in September 1994 or as of the time Chisolm brought suit in March 1995? Because we find that the Vicinage was not an "arm of the state" under Fitchik at either of these times, we need not resolve this question here.

12

state law, our analysis is more difficult. Since the state takeover of administrative authority and responsibility for the unified, state-based court system on January 1, 1995, state law generally has treated the Vicinage as a state entity. Indeed, the New Jersey Constitution provides that the Superior Court is the state's trial court of original jurisdiction and that the Chief Justice of the Supreme Court is the administrative head of all courts within the state. See N.J. Const. Art. VI, S7, P 1. These facts seem to suggest that the Vicinage's status under state law changed from a county entity to a state entity in connection with the judicial unification. On the other hand, the Vicinage was funded, administered and operated by Mercer County at the time of the alleged discrimination. See N.J. Stat. S 2B:10-2 (2001) (describing county administration of county courts prior to the enactment of the SJUA). More importantly, New Jersey state statutes continue to make the counties responsible for providing interpretive services. See id. at 2B:8-1.

From the above we can see that the Vicinage performs different functions, judicial and administrative, in different capacities. The Vicinage has performed many of its judicial functions in its capacity as a state entity under New Jersey law. However, when the Vicinage provides, or fails to provide, interpretive services, it performs, or fails to perform, a function which is the administrative responsibility of a county under New Jersey law. When we apply the second Fitchik factor, we must consider the capacity in which the entity was acting when its actions gave rise to the plaintiff 's claim. See Carter v. City of Philadelphia, 181 F.3d at 353 (holding that although a district attorney may be deemed a state actor with regard to prosecutorial functions, she was a local policymaker with respect to administrative matters). Because Chisolm's claim against the Vicinage is based on its failure to provide interpretive services, this suit relates to the Vicinage's function as a county entity under state law. Accordingly, the second factor also weighs against the Vicinage's claim of sovereign immunity.

The third and final Fitchik factor is the Vicinage's degree of autonomy. According to the New Jersey Constitution,

13

Superior Court judges are nominated and appointed by the Governor with the consent and advice of the state senate. See N.J. Const. Art. VI, S 6, P 1. As such, the court is an independent branch of New Jersey's state government. The Vicinage's degree of autonomy is mitigated somewhat by the state's assumption of certain costs and liabilities of county government in connection with the SJUA. See N.J. Stat. SS 2B:10-1 et seq. (2001). However, because the county is charged by law to provide interpretive services, and is not regulated by the state in performing this function, the Vicinage was autonomous in respect to the conduct which is the basis for Chisolm's claim. See Carter v. City of Philadelphia, 181 F.3d at 352 (distinguishing between district attorney's state prosecutorial and county managerial functions)

Balancing the Fitchik factors discussed above, we conclude that the Vicinage was not acting as an "arm of the state" either at the time of the alleged discrimination or at the time that the suit against it was filed. For these reasons, we conclude that Chisolm's suit against the Vicinage is not barred by the Eleventh Amendment.

B. Review of Summary Judgment

We turn now to our consideration of the propriety of granting summary judgment in favor of MCDC and the Vicinage. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. S 12132.9 Regulations promulgated by the

_____

9. The Rehabilitation Act provides that a qualified disabled person shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. 794(a) (2001). The NJLAD provides that "[a]ll persons shall have the opportunity to obtain . . . all the accommodations, advantages . . . and privileges of any place of public accommodation" without discrimination on the basis of disability. N.J. Stat. Ann.S S 10:5-4, 10:5-4.1.

United States Attorney General require that public entities take certain pro-active measures to avoid the discrimination proscribed by Title II. See id. at 12134(a) (directing the Attorney General to promulgate regulations necessary to implement Title II); 28 C.F.R. SS 35.101 et seq. (1991). Furthermore, we have held that:

> Because Title II was enacted with broad language and directed the Department of Justice to promulgate regulations as set forth above, the regulations which the Department promulgated are entitled to substantial deference. Blum v. Bacon, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). ("[T]he interpretation of [the] agency charged with the administration of [this] statute is entitled to substantial deference.").

Helen L., 46 F.3d at 331-32 (emphasis added).

Appellees do not dispute that Chisolm is a qualified individual with a disability. Moreover, the fact that he was imprisoned at the time of the alleged discrimination does not preclude him from receiving the benefits of the ADA. Title II of the ADA applies to services, programs and activities provided within correctional institutions. See Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206 (1998). We must determine, therefore, whether, in light of the regulations promulgated by the Attorney General, there are issues of material fact as to whether MCDC and the Vicinage discriminated against Chisolm in violation of Title II.

_____

We have recognized that law developed under the Rehabilitation Act is applicable to Title II of the ADA, see Helen L. v. DiDario, 46 F.3d 325, 330-31 & n.7 (3d Cir. 1995), and that Congress has directed that Title II of the ADA be interpreted to be consistent with the Rehabilitation Act. See Yeskey v. Commonwealth of Pennsylvania Dept. of Corrections, 118 F.3d 168, 170 (3d. Cir. 1997). Moreover, New Jersey courts typically look to federal anti-discrimination law in construing NJLAD. Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 70 (3d Cir. 1996). Therefore, we will confine our discussion to the ADA with the understanding that the principles will apply equally to the Rehabilitation Act and NJLAD claims.

15

1. Title II Regulations Applicable to MCDC and the
   Vicinage

Generally, regulations require public entities to take
"appropriate steps" to ensure that communication with a
disabled person is as effective as communication with
others. 28 C.F.R. S 35.160(a). Furthermore,"[w]here
necessary to afford an individual with a disability an equal
opportunity to participate in, and enjoy the benefits of, a
service, program, or activity," a public entity must furnish
"appropriate auxiliary aids and services." Id. at
35.160(b)(1).

The lone regulatory limitation on this duty is embodied in
Section 35.164 of the subpart. Section 35.164 provides that
a public entity may be relieved of its duty only upon
proving that, considering all funding and operating
resources available, the proposed action would result in
either (1) a fundamental alteration in the nature of the
service, program or activity or (2) undue financial or
administrative burdens. To qualify for the Section 35.164
exemption, a public entity must provide a written statement
explaining its conclusions. A public entity claiming the
exemption must also take alternative action not resulting in
such an alteration or burden, but nevertheless ensuring, to
the maximum extent possible, that disabled individuals
receive the public entity's benefits and/or services.

"In determining what type of auxiliary aid and service is
necessary, a public entity shall give primary consideration
to the requests of the individual with disabilities." Id. at
35.160(b)(2).10 For deaf and hearing-impaired persons,
auxiliary aids and services include:

_____

10. That a public entity must give preference to a disabled person's
choice of auxiliary aid over an alternative is echoed in the Appendix to
the regulations. In relevant part, the Appendix provides:

        [t]he public entity must provide an opportunity for individuals
with
        disabilities to request the auxiliary aids and services of their
choice.
        This expressed choice shall be given primary consideration by the
        public entity (S 35.160(b)(2)). The public entity shall honor the
choice
        unless it can demonstrate that another effective means of
        communication exists or that use of the means chosen would not be
        required under S 35.164. Deference to the request of the individual
        with a disability is desirable because of the range of
disabilities, the
        variety of auxiliary aids and services, and different circumstances

requiring effective communication.

28 C.F.R. Pt. 35, App. A (emphasis added).

16

> Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

28 C.F.R. S 35.104(1). The Appendix to the regulations explains that:

> [A]lthough in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient. For example, a qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.

28 C.F.R. Pt. 35, App. A.

### 2. MCDC

Chisolm argues that MCDC discriminated against him on the basis of his disability on three separate occasions. First, Chisolm claims that MCDC violated Title II of the ADA, the Rehabilitation Act, and the NJLAD when it failed to provide him with an ASL interpreter during its intake procedure and medical evaluation. Chisolm alleges that this failure deprived him of basic intake information including the reason for his detention and the rules and regulations of MCDC. Further, Chisolm claims that the failure to provide an ASL interpreter during his intake and evaluation resulted in his receiving inappropriate classifications. The second basis for Chisolm's claim against MCDC arises out of MCDC's failure to provide Chisolm with a TDD device. According to Chisolm, this failure denied him the privilege of placing telephone calls enjoyed by similarly situated

17

inmates without hearing disabilities. Finally, Chisolm claims that MCDC's failure to activate closed captioning capabilities available on a prison television discriminated against him.

MCDC has asserted that, in reviewing Chislom's claims, we must consider the necessity of providing a particular auxiliary aid or service in light of the prison setting. Citing Turner v. Safley, 482 U.S. 78 (1987), MCDC contends that courts must defer to prison management decisions, specifically with respect to security.11  But see Yeskey v. Penna. Dept. of Corrections, 118 F.3d 168, 174-75 & n. 8 (3d Cir. 1997) (declining to decide "the controversial and difficult question" of whether the Turner standard for judicial deference should be applied to statutory as well as constitutional claims), aff 'd on other grounds, 524 U.S. 206 (1998). Although at least one court has adopted the Turner test for judicial deference to prison management decisions in the ADA context, see Gates v. Rowland, 39 F.3d 1439, 1446-1447 (9th Cir. 1994), we need not reach the issue here. MCDC's repetition of the word "security" in its brief and general references to "security" issues in the warden's deposition are not supported by any showing that"security" in fact is implicated in making available to an inmate at appropriate times the services and aids that Chisolm requested.

MCDC also contends generally, and the District Court found as a matter of law, that because Chisolm was incarcerated for only four days, MCDC was not obligated to provide aids or services applicable in cases involving "longer term" inmates. See e.g., Duffy, 98 F.3d at 455 (involving a deaf inmate incarcerated for over ten years); Clarkson v. Coughlin, 898 F. Supp. 1019, 1045-46 (S.D.N.Y. 1995) (finding that long term state inmates were entitled to sign-language interpreters for reception, testing, and classification process resulting in permanent assignments to prisons). However, MCDC does not cite any regulation, statute or case either distinguishing between the needs of

_____

11. To support this proposition, MCDC also cites Inmates of Allegheny County Jail v. Wecht, 93 F.3d 1124, 1136 (3d Cir. 1996), notwithstanding the fact that the opinion was vacated. See id. at 1146.

short term and long term inmates or suggesting that short term facilities are exempted from compliance with Title II. Furthermore, we have been unable to locate any such authority. The length of Chisolm's detention may impact a factfinder's determination of whether MCDC discriminated in violation of the regulations promulgated under the ADA. However, a facility such as MCDC that houses detainees for an average of 60 days is not excluded automatically from Title II of the ADA. We see no basis then to recognize as a matter of law any distinction regarding the appropriateness of an auxiliary aid or service based upon the duration of an ADA claimant-inmate's detention.

In addition, with respect to the first two bases of Chisolm's claim, the failure to provide an ASL interpreter and the failure to promptly provide a TDD, MCDC argues that it employed alternative but effective auxiliary aids. The most obvious problem with this argument is that it conflicts with the regulatory mandate that a public entity honor a disabled person's choice of auxiliary aid or service. See 28 C.F.R. Pt. 35, App. A. Accordingly, to support the District Court's grant of summary judgment with respect to these two bases, the record must show that either (1) the alternative aid and/or service provided was effective or (2) provision of the requested aid and/or service would not be required under Section 35.164. See id.

Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment. Compare Randolph v. Rodgers, 170 F.3d 850, 860 (8th Cir 1999) (reversing grant of summary judgment to deaf inmate because whether provision of a sign language interpreter during disciplinary hearing was an appropriate auxiliary aid was a fact question) and Duffy v. Riveland, 98 F.3d 447, 454, 455 (9th Cir. 1996) (holding that the qualifications of an interpreter and the deaf inmate's ability to communicate in prison disciplinary hearing were fact questions precluding summary judgment) with McGregor v. Louisiana State Univ. Bd. of Supervisors, 3 F.3d 850, 855 (5th Cir. 1993) (granting summary judgment to defendant law school, despite questions of fact as to requested aid, because requested aid would fundamentally modify program). As discussed more

19

particularly below, Chisolm has presented evidence
sufficient to raise genuine issues of material fact regarding
the effectiveness of the alternative aids provided by MCDC.

Nor does the record suggest that MCDC is exempted
under 28 C.F.R. S 35.164 from the regulatory obligation to
provide a requested auxiliary aid and/or service. MCDC
argues that providing Chisolm with an ASL interpreter and
TDD would have caused either undue burden to or
fundamental alteration of MCDC. However, it is not clear
from the record that MCDC complied with the requirements
of Section 35.164. Specifically, there is no indication that
MCDC issued written statements of its reasons for denying
Chisolm's requested auxiliary aids. See 28 C.F.R. S 35.164
(2001). Additionally, whether the alternative aids protected
Chisolm's interests "to the maximum extent possible"
without unduly burdening MCDC or fundamentally altering
its programs presents an unresolved question of fact. Id.

Having addressed the general arguments raised by MCDC
in response to Chisolm's claim, we now turn to MCDC's
specific responses to the individual bases of Chisolm's
claim.

    a. Failure to Provide an ASL Interpreter

Chisolm claims that MCDC violated Title II of the ADA
when it failed to provide him with an ASL interpreter during
his intake and classification. That MCDC did, in fact, fail to
provide Chisolm with an ASL interpreter is not in dispute.
However, MCDC responds to this claim by suggesting that
its personnel were able to communicate with Chisolm
effectively by lipreading and writing on a pad of paper.

In determining that MCDC demonstrated the
effectiveness of these alternative auxiliary aids provided to
Chisolm, the District Court did not resolve all reasonable
factual inferences in favor of Chisolm, the non-moving
party. Chisolm presented evidence indicating that ASL was
his primary language of communication and that he was
not proficient in either lipreading or written English.12 From

_____

12. The parties do not dispute that Chisolm communicates primarily
through ASL. According to his unrebutted expert report, Chisolm's

20

this evidence, a reasonable trier of fact could infer that these alternative aids were ineffective. Indeed, the erroneous classification of Chisolm as an unemployed vagrant creates a reasonable inference that the communication aids employed by MCDC were not, in fact, effective.

In support of its conclusion that the combination of lipreading and note writing was an effective auxiliary aid, MCDC cites to a single statement made by Chisolm during a deposition. In this statement, Chisolm confirms that the MCDC personnel with whom he was communicating did everything that he requested in writing. Id. While this statement may influence a trier of fact's assessment of whether the pad of paper and pencil were effective auxiliary aids, it does not show their effectiveness as a matter of law. Necessarily, Chisolm's ability to make written requests was dependent upon his ability to write in English. When considered in a light most favorable to Chisolm and together with the evidence that Chisolm is not proficient in written English, the deposition statement is not dispositive of the issue of effectiveness.

Finally, there is no indication in the record that, under Section 35.164, MCDC was exempt from the requirement to provide Chisolm with an ASL interpreter. MCDC argues that allowing an ASL interpreter "onto the living unit" of MCDC would conflict with safety and security concerns regarding the "orderly function of MCDC." Safety and security concerns likely were implicated by Chisolm's request for an ASL interpreter. Nevertheless, by suggesting that an ASL interpreter would be placed "onto the living unit," MCDC interprets Chisolm's request as an extremely broad one. Factual issues exist as to whether MCDC could have provided an ASL interpreter at critical points, including intake, medical evaluations, and classification,

_____

lipreading skills are "extremely limited" and he misinterprets unexpected utterances as expected ones. The report also notes that his written English "exhibits characteristics of an partially learned second language." Similarly, his ability to read English is limited by his poor mastery of grammar and vocabulary.

21

while still taking into account legitimate safety and security concerns.

b. Failure to Provide a TDD

MCDC also resists Chisolm's claim that MCDC unlawfully discriminated against him by failing to promptly provide him with access to a TDD. To the extent that other, non-disabled inmates had access to communication by telephone, MCDC was required to provide Chisolm with such access on nondiscriminatory terms. See 42 U.S.C. S 12132. Both Chisolm and his roommate, Kenneth Knight, requested that a TDD be provided as an auxiliary aid. Nevertheless, MCDC cites safety concerns as justifying its failure to promptly provide a TDD and suggests that it provided alternative, but effective, auxiliary aids. The District Court found MCDC's refusal to promptly provide a TDD "reasonable" as a matter of law. Chisolm, 97 F.Supp.2d at 623-24. However, in reaching this conclusion, the District Court resolved various factual disputes against Chisolm.

Citing McManimon's affidavit, MCDC argues that a TDD machine and/or its constituent parts could be used as a weapon and that Chisolm would pose a security risk if allowed "unrestricted access to his TTD on the living unit." Like MCDC's broad characterization of Chisolm's request for an ASL interpreter, this statement may overstate the safety or security threat posed by Chisolm's request for an auxiliary aid. It is not clear that Chisolm requested -- or would have needed -- "unrestricted" access to a TDD. Furthermore, we do not know whether this auxiliary aid could have been provided somewhere other than "on the living unit." Chisolm argues that he merely wanted access to a TDD so that he could place calls like other detainees.

In lieu of providing Chisolm with his choice of auxiliary aid upon request, MCDC made two exceptions to its institutional rules in an effort to accommodate Chisolm's needs. First, MCDC permitted Donna Walker to place a telephone call to Knight on Chisolm's behalf. Second, after Chisolm was provided with an TDD, MCDC allowed Chisolm to place calls in excess of the usual fifteen minute

22

limit to account for the delays associated with typing into a TDD. The District Court found as a matter of law that these alternative concessions made by MCDC in lieu of providing Chisolm with a TDD were "reasonable" in light of safety and security concerns in the prison setting. Chisolm, 97 F.Supp.2d at 623–24. However, in so finding, the District Court once again resolved factual disputes against Chisolm. Chisolm's contention that he "could not contact his attorney, friends, or family" for lack of a TDD raises a reasonable factual inference that MCDC's alternative aids were not effective. Furthermore, there is no indication that MCDC complied with the requirements of Section 35.164 when it refused to promptly provide Chisolm with a TDD.

### c. Failure to Activate Closed Captioning

In response to Chisolm's claim that MCDC discriminated against him when it failed to activate closed captioning on a prison television, both MCDC and the District Court note that Chisolm failed to request closed captioning. Citing Randolph, 170 F.3d at 858, the District Court and MCDC maintain that MCDC had no obligation to activate the closed captioning absent a specific request from Chisolm.

This analysis is flawed for three reasons. First, there is no evidence that Chisolm knew that closed captioning services were available. Second, even if we did adopt the Eighth Circuit's Randolph rule, cited by the District Court, it would be inapplicable if MCDC had knowledge of Chisolm's hearing disability but failed to discuss related issues with him. See Randolph, 170 F.3d at 858–59 ("While it is true that public entities are not required to guess at what accommodations they should provide, the requirement does not narrow the ADA or RA so much that the [public entity] may claim [the disabled person] failed to request an accommodation when it declined to discuss the issue with him."). Finally, the adequacy of MCDC's communication with Chisolm lies unresolved at the heart of this case. As such, whether Chisolm even could have communicated a request for closed captioning presents a question of fact that has not yet been resolved.

For the above reasons, we conclude that the District Court improperly granted summary judgment in favor of McManimon.

23

3. The Vicinage

Chisolm argues that the Vicinage discriminated against him when it failed to arrange for and provide an ASL interpreter for his scheduled extradition hearing on September 14, 1994. Chisolm argues that by postponing the hearing until an ASL interpreter was available and remanding Chisolm to MCDC, the Vicinage injured him in connection with the alleged discrimination. For the reasons stated below, we hold that the District Court erred in granting summary judgment in favor of the Vicinage with respect to this claim.

The District Court granted summary judgment to the Vicinage reasoning that, because no extradition hearing was held, the Vicinage did not exclude Chisolm from any programs. See Chisolm, Civ. No. 95-0991 at 12. This conclusion ignores the broad language of the statutes under which Chisolm brings his claims against the Vicinage. Without showing that the Vicinage excluded him from an extradition hearing, Chisolm may bring his claim under the theory that the Vicinage denied him an extradition hearing. See 42 U.S.C. S 12132. Furthermore, each of the relevant statutes, Title II of the ADA, the Rehabilitation Act, and the NJLAD, proscribes discrimination on the basis of disability without requiring exclusion per se. See id. ("[N]o qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any [public] entity."); 29 U.S.C. S 794(a) (providing that a qualified disabled person shall not, "solely by reason of her or his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance"); N.J. Stat. S 10:5-4.1 ("All of the provisions of the act . . . shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped . . . ."). The record, when viewed in a light most favorable to Chisolm, raises a genuine issue as to whether or not the Vicinage either discriminated against Chisolm on the basis of his disability or otherwise denied him the benefits of an activity, program or service.

The District Court found, and we agree, that extradition hearings are "programs" within the definition of the ADA

24

and the Rehabilitation Act. See Chisolm, Civ. No. 95-0991 at 12, n.7 (citing Duffy, 98 F.3d at 455). A reasonable trier of fact could find that the Vicinage denied Chisolm the ability to participate in an extradition hearing to the same extent non-disabled individuals are able to participate. The Vicinage does not dispute that Chisolm's extradition hearing would have occurred as scheduled on September 14, 1994, were it not for Chisolm's inability to communicate without an auxiliary aid and/or service. Therefore, Chisolm faced an additional six days of incarceration solely because of the Vicinage's inability to provide him with an auxiliary aid or service at his scheduled extradition hearing.

The Vicinage argues that its "affirmative measures" to locate an ASL interpreter, in fact, "complied fully with" the regulations. However, it is up to the trier of fact to determine whether the Vicinage provided a sufficient auxiliary aid and/or service when it rescheduled Chisolm's hearing and ordered him remanded into custody for a further six days until an ASL interpreter could be present. See Randolph, 170 F.3d at 859; Duffy, 98 F.3d at 455-56.

The Vicinage also argues that the failure to provide an auxiliary aid and/or service upon Chisolm's scheduled extradition hearing was justified because the Vicinage lacked notice of Chisolm's disability. Although not expressly framed as such, this argument appears to invoke the Section 35.164 exception to the general rule that a public entity must provide a disabled individual with a requested auxiliary aid and/or service. Section 35.164 exempts public entities from providing a requested aid or service only if doing so would cause a "fundamental alteration" to the entity's programs or would create undue financial or administrative burdens. 28 C.F.R. S 35.164. Providing Chisolm with an ASL interpreter would not fundamentally alter the extradition hearing, as is evidenced by the fact that a New Jersey statute expressly mandates this service. See id.; N.J. Stat. 2B:8-1 (2001). Therefore, the Vicinage could avoid providing Chisolm with an ASL interpreter only if doing so would create "undue financial and administrative burdens." 28 C.F.R. S 35.164.

Assuming arguendo that it would have been unduly burdensome for the Vicinage to provide Chisolm with an

25

ASL interpreter on such short notice, it is not clear from the record that the Vicinage complied with Section 35.164. Specifically, there is no indication that the Vicinage issued a written statement of its reasons for denying Chisolm's requested auxiliary service. Additionally, whether remanding Chisolm into custody for six additional days ensured Chisolm's access to an extradition hearing"to the maximum extent possible" without unduly burdening the Vicinage is an unresolved question of fact.

Moreover, to the extent that the Vicinage argues a"lack of notice" of Chisolm's disability, that lack of notice may demonstrate a failure of the Vicinage to discharge its statutory responsibility of providing interpretive services for the deaf. The provision of such services must include some reasonable means of determining when they will be needed.

IV. Conclusion

We conclude that, for purposes of determining whether the Vicinage may assert sovereign immunity, it was not acting as an "arm of the state." Therefore, the Eleventh Amendment to the United States Constitution does not provide the Vicinage with immunity from Chisolm's suit.

As for summary judgment, Chisolm has demonstrated that genuine issues of material fact remain for trial. Thus, the trial court erred in granting summary judgment in favor of defendants. We will reverse the judgments in favor of McManimon and the Vicinage and remand this case to the District Court for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

26