Eddie WILLIAMS, Plaintiff,

v.

George HAYMAN, et al., Defendants.

Civil Action No. 06–3705.

United States District Court,
D. New Jersey.

June 17, 2008.

John M. Armstrong, Esq., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, for Plaintiff Eddie Williams.

Sarah Brie Campbell, Deputy Attorney General, Office of the Attorney General of New Jersey, Department of Law & Public Safety, Trenton, NJ, for Defendants.

## OPINION

SIMANDLE, District Judge:

## I. INTRODUCTION

Plaintiff filed the Complaint in this action while he was incarcerated at South Woods State Prison ("SWSP"), alleging that he was denied access to various programs and services at SWSP because he is deaf, which, he argues, violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.* The defendants herein are George W. Hayman, Commissioner of the New Jersey Department of Corrections; Joseph D'Amico, Executive Director of the New Jersey Parole Board; Katherine MacFarland, Chief Administrator of SWSP; Amadou Jalloh, Assist Administrator of SWSP; Linda Everett, Parole Administrator of SWSP; Officer Prianccini; Linda Solanik, a social worker at SWSP; Cheryl Bard, a social worker at SWSP; and Dr. Banks, a psychiatrist at SWSP. Defendants have moved (1) to dismiss the complaint because Plaintiff allegedly failed to exhaust his administrative remedies as is required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and (2) for summary judgment on the grounds that Plaintiff was provided access to the programs and services in question, that the individual defendants are entitled to qualified immunity, and that Plaintiff is entitled neither to punitive nor compensatory damages. (Docket Item 27.)

The principal issues to be decided involve (1) whether a deaf inmate who has demonstrated himself to be incapable of clear written communication must nonetheless comply with the requirement of submitting a written administrative remedy form and exhausting the written administrative appeal process in order to comply with the PLRA's prerequisite to the inmate's filing of suit, and (2) whether individual governmental employees may be held liable under Title II of the ADA. The Court will also examine whether Plaintiff's evidence creates a genuine dispute of material fact whether Plaintiff's ADA rights have been violated by being precluded from participating in available prison programs on account of his hearing disability.

For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion as follows: (1) the Court will grant the Individual Defendants' motion and dismiss them from this case; (2) Defendants' motion to dismiss Plaintiff's claim for punitive damages will be granted; and (3) the remainder of the relief sought in Defendants' motion will be denied.

## II. BACKGROUND

### A. The Alleged Denial of Services and Plaintiff's Complaint

The plaintiff, Eddie Williams, is a thirty-seven-year-old deaf man. (Brooks Aff. Ex. A 1; Villar Aff. Ex. B 3.) On November 13, 2005, Mr. Williams was sentenced to a three-year term of imprisonment for aggravated assault and was transferred to the custody of the New Jersey Department of Corrections ("NJDOC"). (Brooks Aff. Ex. A 1.) Mr. Williams was transferred to SWSP on December 13, 2005. (Id. at 5.) The day after Mr. Williams was transferred to SWSP, December 14, 2005, he completed an NJDOC form entitled "Request for Deaf and Hard of Hearing Inmates," on which he answered affirmatively to the question, "Will a sign language interpreter help us communicate effectively with you?" (Villar Aff. Ex. C.) Mr. Williams also indicated on the form that he wanted a "Telecommunication Device for the Deaf TDD/TTY with Light Signaler" and television captioning. (Id.) Mr. Williams signed the form, as did De-

fendant Cheryl Bard, an NJDOC social worker. (Id.)

On June 28, 2006, Mr. Williams wrote a letter to New Jersey Governor Jon Corzine complaining of his inability to participate in certain programs at SWSP on account of his disability.[1] (Dill Aff. Ex. A 1.) Mr. Williams' letter was referred to Karen Willoughby, Director of the Division of Operations at NJDOC, who wrote Mr. Williams a letter dated July 19, 2006 in which she informed him that "[i]nmates with hearing impairments are not precluded from" participating in the inmate programs offered at SWSP. (Id.) Ms. Willoughby's letter also made note of the fact that Mr. Williams had not yet participated in any such programs and that "the State Parole Board will look favorably upon your program participation when determining your suitability for parole release." (Id.)

Mr. Williams responded to Ms. Willoughby's letter in a letter dated July 28, 2006, in which he complained that he had been denied access to "a number of services due to [his] hearing impairment."[2] (Id. at 2.) Mr. Williams clarified that he had "continually requested programs" but that his requests had been ignored because SWSP could not afford to hire an interpreter, and that the social worker who conducted the behavior modification program was not an official interpreter. (Id. at 2–3.) Finally, Mr. Williams informed Ms. Willoughby that there were no "TTY phone systems" on his tier, noting that the

---

1. Neither party submitted to the Court a copy of Mr. Williams' June 28, 2006 letter, and so the precise details of Mr. Williams' complaint are not clear from the record.

2. It is apparent to the Court that Mr. Williams received some assistance in preparing the letters he sent to Ms. Willoughby. Mr. Williams' written communications to the Court indicate that his ability to communicate in writing is

very limited, (see, e.g., Pl.'s Opp'n Br. Ex. D), whereas his letters to Ms. Willoughby are clear and intelligible. As Mr. Williams testifies in his affidavit, he has "great difficulty with communicating, even in writing" and "often leave[s] out important words that are commonly used by other people when writing or speaking." (Williams Aff. ¶¶ 21–22.)

other inmates had access to telephones "at any time."[3] (*Id.* at 3.)

Ms. Willoughby responded in an August 15, 2006 letter, in which she stated that it was her understanding that social worker Cheryl Bard conducted Mr. Williams' behavior modification program and that Ms. Bard could communicate effectively with Mr. Williams with sign language. (*Id.* at 8.) With regard to Mr. Williams' complaint about access to the TTY system, Ms. Willoughby advised Mr. Williams that he could use the system between 8:45 a.m. and 10:30 a.m. and between 1:00 p.m. and 2:00 p.m. on weekdays and noted that Mr. Williams had used the system twelve times in a two-month period. (*Id.*) Finally, Ms. Willoughby stated that Mr. Williams was to utilize SWSP's Inmate Remedy Form rather than corresponding directly with the NJDOC to address his concerns about access to SWSP programming and education. (*Id.*)

On August 16, 2006, Mr. Williams filed the instant Complaint [Docket Item 1]. The Complaint alleges that Mr. Williams sought to participate in "a multitude of social and educational programs (A/A, N/A, Behavior Modification) which all were denied because the social worker advised him [that] the prison would not and/or will not hire an interpreter because it was too expensive." (*Id.* at 5.) In the section of the civil rights complaint form directing the plaintiff to explain whether he has "sought informal or formal relief from the appropriate administrative officials regarding the acts complained of," Mr. Williams wrote the phrases "Institutional Remedy" and "Complaints Department of Corrections." (*Id.* at 3.)

On August 24, 2006, Mr. Williams submitted an Inmate Remedy Form to SWSP. His complaint form reads in its entirety: "Ms barb conducts a Behavior Modification Program with me And she is capable of communicationing efficiently with use of sign language I have to telling you that true but Ms barb have not certified of interpreter." (Villar Aff. Ex. B 7.) On August 28, 2006, Mr. Williams received a written response to the complaint on his Inmate Remedy Form, which read in full: "You are correct—Ms. Bard is not a Certified Interpreter. Behavior Modification is not a judicial or quasi-judicial proceeding that requires the use of a certified interpreter." (*Id.*)

After this action was commenced, Plaintiff deposed Ms. Bard about her ability to communicate with Plaintiff through sign language. At her deposition, Ms. Bard testified that before she endeavored to learn sign language, no one employed by the prison knew sign language; she stated that she "became curious [about sign language] because there was nobody here to help [hearing-disabled inmates]." (Bard Dep. 10.) Ms. Bard further testified that she took a sign language course and had a book on the subject, but was primarily "self-taught." (*Id.*) She indicated that her sign language vocabulary was limited, that she communicated with deaf inmates "the best that [she] could," and that she resorted to "finger spell[ing]" or communicating in writing when her sign language abilities proved insufficient. (*Id.* at 36–37.) Despite these apparent limitations, Ms. Bard testified that she was not aware of any occasions when Plaintiff did not appear to understand what she was trying to tell him, since they "would work it back and

---

**3.** A TTY, which stands for "telephone typewriter," is "an electronic device for text communication via a telephone line, used when one or more of the parties has hearing or speech difficulties." Wikipedia, *Telecommunications Device for the Deaf*, http://en.wikipedia.org/wiki/Telecommunications_devices_for_the_deaf (last visited June 2, 2008).

forth until [they] got to what he wanted." (*Id.* at 20.)

### B. SWSP Policies

#### 1. *Access to SWSP Programs for Hearing–Disabled Inmates*

In their submissions, Defendants have highlighted various SWSP policies that are relevant to this litigation. First, Defendants state that as a general matter, SWSP provides access to programs and services for hearing-disabled inmates. (Villar Aff. ¶ 9.) At three locations in the prison—the intake area, the court line, and the medical area—signs with the following text are posted:

> Notice to Deaf & Hard of Hearing—You have the right to a sign language interpreter if one is required for you to effectively communicate with Corrections staff. If you are deaf or hard of hearing and require a sign language interpreter to communicate, please let us know.

(*Id.* at ¶ 10.) Copies of this notice are also provided to each inmate. (*Id.*) According to Defendants, SWSP staff communicate with hearing-impaired inmates using the inmate's preferred method of communication, including sign language, whenever possible. (*Id.* at ¶ 12.) If an inmate's preferred method of communication is sign language, then a "Certified Interpreter" is used to communicate with the inmate during all judicial and quasi-judicial proceedings, including parole, classification, and disciplinary proceedings.[4] (*Id.* at ¶ 13.) SWSP does not use certified interpreters to communicate with deaf inmates in other contexts, but instead uses "qualified" (but not certified) interpreters. (*Id.*) According to Defendants, Ms. Bard, a SWSP social worker, is a qualified sign language interpreter. (Dill Aff. Ex. A 5.)

#### 2. *Administrative Remedy Program at SWSP*

Defendants also submitted evidence pertaining to SWSP's Inmate Grievance and Tracking Program (the "Grievance Program"). The Grievance Program is an administrative mechanism at SWSP "designed to provide a direct and confidential route for inmates to make the Administration aware of their problems and concerns [and to] allow the Administration to effect timely and appropriate responses to these problems and concerns." (Villar Aff. Ex. A.) Although the SWSP Inmate Handbook describes the Grievance Program as a four-step process, Defendants indicate that three of the four steps apply only to parole-related requests and are not applicable to Mr. Williams' case. (*Id.*; Villar Aff. ¶ 6.) For complaints not related to parole, the Grievance Program requires inmates to complete an Administrative Remedy Form and place the form in one of the prison's drop boxes. (Villar Aff. Ex. A.) The Inmate Handbook instructs inmates that their "[w]riting must be legible and the problem/concern specific to the issue." (*Id.*) Additionally, inmates are instructed that "[t]he inmate submitting the form is the only person who may prepare the form. The unit Social Worker may assist if necessary." (*Id.*) Once the inmate has received a response to his Administrative Remedy Form, "his administrative remedies have been exhausted." (Villar Aff. ¶ 6.)

### C. Procedural History

Plaintiff, who was proceeding *pro se* when this action commenced, filed his Complaint on August 8, 2006. (Docket Item 1.) On August 31, 2006, Plaintiff filed a motion for the appointment of pro bono

---

**4.** At Plaintiff's initial classification hearing on December 20, 2005, and at his parole hearing on February 17, 2006, a certified interpreter was present. (Villar Aff. Ex. D, E.)

counsel, (Docket Item 4), which the Magistrate Judge denied as premature on September 8, 2006. (Docket Item 5.) Defendants subsequently moved to dismiss and/or for summary judgment. (Docket Item 27.)

In its June 11, 2007 Opinion and Order, 488 F.Supp.2d 446, the Court found "that the interests of justice require the appointment of counsel to assist Mr. Williams in the prosecution of this case." (488 F.Supp.2d at 448.) Specifically, the Court noted that

> Plaintiff has a limited ability to present his case on his own; the legal issues are quite complex; factual investigation will be necessary; Plaintiff's ability to pursue such investigation is impaired by his continued incarceration and limited resources; and Plaintiff cannot afford counsel on his own behalf.

(*Id.* at 449.) The Court accordingly ordered the appointment of pro bono counsel to represent Plaintiff and denied Defendants' motion to dismiss without prejudice to reinstatement following the appointment of counsel. (*Id.* at 449–50.) Defendants' motion was reinstated on November 7, 2007. (Docket Item 43.)

On January 4, 2008, the Court convened a hearing to hear oral argument on Defendants' motion to dismiss and/or for summary judgment. At the request of Plaintiff's counsel, the Court permitted Plaintiff to conduct limited discovery related to Defendants' motion, authorizing Plaintiff to depose Ms. Bard, the SWSP social worker who Plaintiff claimed could not communicate with him effectively in sign language. The parties also submitted supplemental briefs addressing the information gleaned from this limited round of discovery.

## III. DISCUSSION

### A. Standard of Review

The Court first addresses the standard of review that governs its analysis of Defendants' motion. Defendants have moved for dismissal pursuant to F.R. Civ. P. 12(b)(6) and/or for summary judgment pursuant to F.R. Civ. P. 56. Because Defendants go "beyond the face of the pleadings" in their motion, the Court will treat Defendants' submission as a motion for summary judgment.[5] *See Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir.1997).

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.*

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119

---

**5.** While the Court treats Defendants' motion as one for summary judgment, it agrees with Plaintiff that not all issues raised in Defendants' submissions are ripe for decision under this standard, since the parties have, to date, conducted very limited discovery. In particular, as the Court explains, *infra*, Defendants' motion for summary judgment as to Plaintiff's claim for compensatory damages will be denied as premature in light of Plaintiff's stated intention to conduct discovery on this matter.

S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505). It there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment may not be granted. *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted).

## B. Exhaustion of Administrative Remedies

■ Defendants argue that Plaintiff's Complaint should be dismissed on account of the fact that Plaintiff failed to exhaust his administrative remedies, which the Prison Litigation Reform Act ("PLRA") requires inmates to complete before they seek to resolve their concerns through litigation. Defendants note that in this Circuit, the PLRA's exhaustion requirements compel prisoners to comply with grievance procedures set out in inmate handbooks, even if the procedures are not formally adopted by the state administrative agency. *See Concepcion v. Morton*, 306 F.3d 1347, 1348–49 (3d Cir.2002). Accordingly, they argue, the Grievance Program set out in the SWSP's Inmate Handbook is an administrative remedy within the meaning of 42 U.S.C. § 1997e(a) which an inmate must exhaust prior to pursuing his claims in court.

In this case, Defendants argue, Plaintiff did not file an Administrative Remedy Form to address his inability to access prison programs and services prior to August 16, 2006, when he filed his Complaint to commence this litigation.[6] Plaintiff did file an Administrative Remedy Form on August 24, 2006, after he filed suit in this case, but, according to Defendants, the complaint form is merely directed at the fact that Ms. Bard is not a certified interpreter, and indeed Plaintiff states on the form that Ms. Bard interprets "efficiently." (Villar Aff. Ex. B 7.)

Defendants further argue that Plaintiff's letters to Ms. Willoughby are insufficient to satisfy the PLRA's exhaustion requirements because, as the Supreme Court recently held, 42 U.S.C. § 1997e(a) requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 2387, 165 L.Ed.2d 368 (2006) (noting that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without some orderly structure on the course of its proceedings"). Mr. Williams was not permitted to invent his own grievance procedure to sidestep the requirements of section 1997e(a), according to Defendants, because exhaustion under the PLRA is required even if the inmate believes that utilizing the internal grievance process would be "futile." *Booth v. Churner*, 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). In short, Defendants argue, Mr. Williams "denied the Defendants the opportunity to review, address and resolve the issues raised in his Complaint at the institutional level before bringing this litigation," which requires that his Complaint be dismissed. (Def.'s Br. 15.)

■ The Court will deny Defendants' motion to dismiss on account of Plaintiff's failure to exhaust administrative remedies. The PLRA provides in relevant part that

[n]o action shall be brought with respect to prison conditions under section 1979

---

**6.** As Defendants note, Plaintiff did in the past file several Administrative Remedy Forms to address different issues, which, they assert, indicates that he was aware of the Grievance Program.

of the Revised Statutes of the United States (42 U.S.C.1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement applies to all inmate suits "about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Furthermore, as Defendants correctly note, exhaustion of all administrative remedies is mandatory whether or not the inmate believes that such administrative remedies would be effective and even if the available administrative processes cannot grant the desired remedy. *Booth*, 532 U.S. at 739–41, 121 S.Ct. 1819. Enforcement of the PLRA's exhaustion requirement serves the twin goals of "protect[ing] administrative agency authority . . . . [and] promot[ing] efficiency." *Ngo*, 126 S.Ct. at 2385. The PLRA's exhaustion requirement furthers these goals by providing the "prisoner who does not want to participate in the prison grievance system" with the "incentive to comply with the system's procedural rules." *Id.* at 2388.

In order for the exhaustion requirement to apply, however, the administrative remedies in question must actually have been "available" for the inmate to exhaust. § 1997e(a). In *Brown v. Croak*, 312 F.3d 109, 112 (3d Cir.2002), for example, the Court of Appeals found that where the plaintiff alleged that prison guards directed him not to follow the formal grievance process, there was a material issue of fact as to "whether these instructions rendered the formal grievance procedure unavailable to him within the meaning of 42 U.S.C. § 1997e." *Id.* (citing *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir.2001), for the proposition that "a remedy that prison officials prevent a prisoner from 'utilizing' is not an 'available' remedy under § 1997e").

■ As in *Croak*, there are unresolved factual questions in this case regarding whether the administrative remedies proffered by Defendants were "available" to Mr. Williams under section 1997e, making the entry of summary judgment for Mr. Williams' failure to exhaust such remedies inappropriate at this time. The Grievance Program at SWSP requires that an inmate complete an Administrative Remedy Form in a manner that clearly specifies the "problem/concern specific to the issue" that the inmate seeks to resolve. (Villar Aff. Ex. A.) Whether Mr. Williams' disability inhibited his capacity to express his grievances comprehensibly in writing in accordance with the Grievance Program's requirements is a triable issue of fact in this case. *Cf. Days v. Johnson*, 322 F.3d 863, 868 (5th Cir.2003) (holding that administrative remedies were not "available" to an inmate whose medical condition prevented him from complying with prison grievance system requirements). Mr. Williams testified that he has "great difficulty with communicating, even in writing" and "often leave[s] out important words that are commonly used by other people when writing . . ." (Williams Aff. ¶¶ 21–22.) One of Mr. Williams' attorneys has likewise testified that she has "had great difficulty getting Mr. Williams to intelligibly respond in writing." (Overton Cert. ¶ 7.) The evidence of Mr. Williams' writing in the record corroborates this testimony regarding the serious limitations on his ability to communicate in writing. (Villar Aff. Ex. B 7.)

The Inmate Handbook expressly forbids inmates from soliciting assistance in preparing Administrative Remedy Forms, fur-

ther suggesting that the Grievance Program was not an "available" remedy for Mr. Williams. Specifically, the Handbook instructs inmates that the "inmate submitting the form is the only person who may prepare the form." (Villar Aff. Ex. A.) It is true that the Handbook permits inmates to request the assistance of the unit social worker in the preparation of Administrative Remedy Forms "if necessary." (*Id.*) However, the essence of Mr. Williams' complaint in this case is that his unit social worker, Ms. Bard, was unable to communicate with him effectively. (Compl. at 5.) If a finder of fact were to credit the evidence in the record indicating that Mr. Williams could not communicate effectively with Ms. Bard, then it would not make sense to suggest that Mr. Williams could have employed Ms. Bard's services in order to render the Grievance Program an "available" administrative remedy.

Mr. Williams' August 24, 2006 Administrative Remedy Form, although submitted after his Complaint was filed, supports his argument regarding his inability to utilize the Grievance Program. On the form, Mr. Williams wrote that Ms. Bard was "capable of communicationing efficiently with use of sign language [ ] I have to telling you that true but Ms barb have not certified of interpreter." (Villar Aff. Ex. B 7.) While the prison officials who received Mr. Williams' complaint form assumed that he was complaining about the fact that Ms. Bard was not a *certified* interpreter, Mr. Williams' testimony in this case is that he intended to address Ms. Bard's inability to communicate with him, but that he was not able to express this concern in writing. (Williams Aff. ¶¶ 16–20.) According to Mr. Williams, "[o]nly now, after discussions with [his] present court-appointed counsel, [has he] realized that what [he] wrote on the complaint form can be read to suggest that [his] problem was with Ms. Bard's lack of 'certification.'" (*Id.* at ¶ 18.) Mr.

Williams states that "[t]he main problem was Ms. Bard's inability to communicate with [him] and [his] inability to understand her." (*Id.* at ¶ 19.) Although the August 24, 2006 Remedy Form does not establish that Mr. Williams actually exhausted the remedies provided by the Grievance Program before filing his Complaint, it is evidence of his inability to articulate his concerns in writing, which calls into question whether the Grievance Program offered Mr. Williams an available administrative remedy.

As was the case in *Croak,* Mr. Williams' "argument is not based upon a futility rationale." *Croak,* 312 F.3d at 113. Nor, if Mr. Williams' evidence is to be believed, was Mr. Williams merely "[a] prisoner who [did] not want to participate in the prison grievance system." *Ngo,* 126 S.Ct. at 2388. Rather, Mr. Williams argues—and a rational jury could find—that the restrictions his disability imposed on his ability to communicate foreclosed the availability of the Grievance Program as an administrative remedy. *See Days,* 322 F.3d at 867–68. Because there are triable issues of fact regarding the availability to Mr. Williams of administrative remedies at SWSP, summary judgment on the issue of administrative exhaustion is inappropriate at this time.

### C. Access to Programs and Services

Defendants have moved for summary judgment on the grounds that Plaintiff was not denied access to programs and services at SWSP on account of his disability, which, they argue, means that he cannot make out a *prima facie* case under Title II of the ADA. Defendants first argue that Mr. Williams was not denied access to SWSP's behavior modification program because Ms. Bard, who taught the behavior modification class, was a qualified interpreter who Mr. Williams himself said was

able to use sign language "efficiently." (Villar Aff. Ex. B at 7.) The ADA does not require SWSP to use certified sign language interpreters, Defendants argue, but instead permits the use of "[q]ualified interpreters." 28 C.F.R. § 35.104. A "qualified interpreter," in turn, is defined under federal regulations implementing the ADA as "an interpreter who is able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary." *Id.* Because Mr. Williams conceded that Ms. Bard can interpret "efficiently" in his August 24, 2006 Administrative Remedy Form, Defendants argue that he cannot now claim that she was not a qualified interpreter. In Defendants' words, "Plaintiff cannot create a question of fact by changing his own version of events." (Def. Reply Br. 7.)

Defendants further argue that Mr. Williams had reasonable access to the TTY telephone system, as is evidenced by his repeated use of the system, noting "[t]he ADA does not create a greater right of access to a person with a disability" than is afforded to non-disabled persons. (*Id.*) Because "Plaintiff can show no set of facts to sustain a jury verdict that he was excluded from, or denied meaningful access to, any program, benefit or service offered at SWSP" on account of his disability, Defendants argue that they are entitled to summary judgment. (*Id.* at 8.)

Mr. Williams argues that triable issues of fact in this case regarding the provision of interpreter and telecommunications services at SWSP preclude the Court from granting Defendants' motion. With respect to SWSP's use of Ms. Bard as a sign language interpreter, Plaintiff argues that he has never conceded that he and Ms. Bard could communicate with each other, which makes the adequacy of Ms. Bard's sign language interpretation a disputed is-

sue of material fact for the jury, rather than the Court, to decide. Mr. Williams argues that Defendants' reliance on his statement in his grievance form that Ms. Bard interprets "efficiently" is misplaced because it takes the statement out of context. Finally, with regard to Defendants' argument that Plaintiff's use of the TTY system demonstrates that he was not denied access to telecommunications services offered to non-disabled inmates, Plaintiff argues that "Defendants' argument misses the point ... [because t]he fact that Mr. Williams was able to use the system *a few times* in spite of defendants' discriminatory practices does not explain away those practices." (Pl.'s Opp'n Br. 11.) Plaintiff argues that factual questions regarding the disparity between Mr. Williams' and other inmates' access to telephones requires that Defendants' motion be denied.

■ The Court will deny Defendants' motion for summary judgment on the issue of whether Mr. Williams was denied access to programs and services at SWSP on account of his disability. Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The Supreme Court has recognized that "[s]tate prisons fall squarely within the statutory definition of 'public entity.'" *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). A plaintiff alleging that a public entity violated Title II must show that

> (1) she is a qualified individual with a disability; (2) she was either excluded from participation in or denied the bene-

fits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of her disability. *Calloway v. Boro of Glassboro Dept. of Police,* 89 F.Supp.2d 543, 552 (D.N.J.2000); *see also Douris v. Dougherty,* 192 F.Supp.2d 358, 368 (E.D.Pa.2002).

■ As to both the adequacy of sign language interpreting for SWSP programs and the availability of telephone services at the prison, there are triable issues of fact that make summary judgment inappropriate.[7] Federal regulations require "public entities to take appropriate steps to ensure that communication with a disabled person is as effective as communication with others." *Chisolm v. McManimon,* 275 F.3d 315, 325 (3d Cir.2001) (quoting 28 C.F.R. § 35.160(a)). "[W]here necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity, a public entity must furnish appropriate auxiliary aids and services." *Id.* (quoting 28 C.F.R. § 35.160(b)(1)). As the Court of Appeals for the Third Circuit has noted, "[g]enerally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment." *Id.* at 327–28 (citing *Duffy v. Riveland,* 98 F.3d 447 (9th Cir.1996) for its holding that "the qualifications of an interpreter and the deaf inmate's ability to communicate in prison disciplinary hearing were fact questions precluding summary judgment").

■ The evidence in the record is plainly insufficient to support a finding that as a matter of law, Ms. Bard was "able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabu-

lary," as federal regulations require. 28 C.F.R. § 35.104. Ms. Bard's own deposition testimony forecloses such a conclusion. Ms. Bard testified that her sign language vocabulary was limited and that she often had to resort to "finger spelling" and communicating in writing in order to speak with hearing-impaired inmates. (Bard. Dep. 10, 36–37.) Moreover, Mr. Williams testified in his affidavit that he and Ms. Bard were unable to communicate effectively with each other. (Williams Aff. ¶ 19.) A reasonable jury could certainly conclude from this evidence that the limited nature of Ms. Bard's sign language abilities prevented her from providing "appropriate auxiliary ... services." *Chisolm,* 275 F.3d at 325.

In their motion for summary judgment, Defendants rely almost exclusively on Plaintiff's statement in his August 24, 2006 inmate grievance form that Ms. Bard can interpret "efficiently." (Villar Aff. Ex. B 7.) This single statement does not resolve the factual question before the Court as a matter of law for at least two reasons. First, the evidence in the record demonstrating the difficulty written communication poses for Mr. Williams raises doubts about exactly what he intended to communicate in the grievance form. Mr. Williams has testified that he has "great difficulty with communicating, even in writing" and "often leave[s] out important words that are commonly used by other people when writing or speaking." (Williams Aff. ¶¶ 21–22.) He also testified that the message he wanted to convey in his grievance form was that he and Ms. Bard could *not* communicate with each other. (*Id.* at ¶ 19.) In light of this evidence, Mr. Williams' single use of the word "efficiently" does not establish the adequacy of Ms. Bard's interpreting skills as a matter of law.

---

7. Defendants do not appear to contest that Mr. Williams is a "qualified" individual with-

in the meaning of the ADA, and there is no dispute that SWSP is a public entity.

Secondly, as the Court discussed, *supra*, even if Ms. Bard's sign language interpretation had indeed been "efficient[ ]," that alone would not necessarily be sufficient to comply with Title II's requirement that an interpreter communicate "effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 35.104. For example, it is not inevitably the case that an efficient interpreter can communicate expressively or with the requisite specialized vocabulary. These are factual questions that are generally not suitable to resolution on a motion for summary judgment. *Chisolm*, 275 F.3d at 327. Although Mr. Williams' statement regarding Ms. Bard's efficiency "may influence a trier of fact's assessment of whether … [Ms. Bard was an] effective auxiliary aid[ ], it does not show [her] effectiveness as a matter of law." *Id.* at 328–29. If a jury were to find that Mr. Williams was unable to participate meaningfully in educational programs at SWSP because of Ms. Bard's inadequate sign language fluency, Mr. Williams would be able to establish that he was "excluded from participation in … a public entity's services, programs, or activities … by reason of [his] disability" in violation of Title II of the ADA. *Calloway*, 89 F.Supp.2d at 552.

▮ The evidence is likewise insufficient to support a finding that as a matter of law, the access to telecommunications services that SWSP afforded to Mr. Williams complied with the requirements of Title II. Defendants' evidence indicates that Mr. Williams had access to the TTY telephone system for almost three hours per day, Monday through Friday, and that Mr. Williams used the TTY system twelve times in a two-month period. (Dill Aff. Ex. A 8.) But the question is not simply whether Mr. Williams had access to the TTY system or was able to use it multiple times, as Defendants' evidence shows, but whether Mr. Williams' access to the TTY system was comparable to non-disabled inmates' access to telephone services. *See Chisolm*, 275 F.3d at 329 ("To the extent that other, non-disabled inmates had access to communication by telephone, [the prison] was required to provide [the plaintiff] with such access on nondiscriminatory terms.").

Plaintiff has testified that there was no TTY system on his tier, despite the fact that non-disabled inmates were able to use the telephone on the tier; that he had to make special arrangements in advance to use the TTY system, whereas non-disabled inmates could use the telephone without such arrangements; and that the limited periods of access to the TTY system inhibited his ability to communicate with his family to a degree that was not experienced by non-disabled inmates. (Williams Supp. Aff. ¶¶ 11–17.) If a jury were to credit this testimony, it could reasonably find that Plaintiff was not afforded access to telecommunications services "on nondiscriminatory terms," *Chisolm*, 275 F.3d at 329, making the entry of summary judgment inappropriate.[8]

Finding that there are triable questions of fact as to whether Plaintiff was "denied

---

8. Under Title II, a public entity may be relieved of its duty to provide equal access to disabled persons if it can establish that the proposed action would result in a "fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164. To qualify for the 35.164 exception,

"[t]he decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." *Id.*

the benefits of a public entity's services ... [or] programs ... by reason of [his] disability," *Calloway*, 89 F.Supp.2d at 552, the Court will deny Defendants' motion for summary judgment on the issue of whether Plaintiff was afforded access to programs and services at SWSP on a nondiscriminatory basis.

## D. Individual Liability Under Title II of the ADA

The individually named defendants have moved for summary judgment on the grounds that Title II does not contemplate

Because Defendants have offered no such written statement, this "lone regulatory limitation" on their duty to provide Mr. Williams comparable access to services and programs at SWSP as is afforded to non-disabled inmates is inapplicable to this case. *Chisolm,* 275 F.3d at 325.

9. While Defendants argue that the Individual Defendants are entitled to qualified immunity, they have not raised the defense that Title II constitutes an invalid attempt to abrogate state sovereign immunity to the extent that it creates a private cause of action for damages against the state for conduct that does not violate the Fourteenth Amendment. *See United States v. Georgia*, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) (holding that Title II of the ADA validly abrogates state sovereign immunity to the extent that it creates a cause of action for conduct that actually violates the Fourteenth Amendment, but leaving open the question of whether abrogation is constitutional where the conduct is not itself unconstitutional). The Court of Appeals for the Third Circuit has held that "the party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability." *Christy v. Pennsylvania Turnpike Com'n*, 54 F.3d 1140, 1144 (3d Cir.1995). As the court explained,

[b]ecause Eleventh Amendment immunity can be expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense. We agree with the Ninth Circuit that whatever its jurisdictional attributes, Eleventh Amendment immunity should be treated as an affirmative de-

individual liability.[9] According to the Individual Defendants, Title II of the ADA creates a cause of action against public entities, but does not contemplate lawsuits against government employees in their individual capacities. *See Emerson v. Thiel College*, 296 F.3d 184, 188 (3d Cir.2002). Plaintiff has not addressed the Individual Defendants' argument that Title II of the ADA does not provide for individual liability.[10]

■■■ The Court agrees with the Individual Defendants that Title II of the ADA

fense, and like any other such defense, that which is promised by the Eleventh Amendment must be proved by the party that asserts it and would benefit from its acceptance. We also agree with the Ninth Circuit that considerations of fairness support this conclusion.

*Id.* (internal quotations and citations omitted).

In this case, the state defendants had the burden of asserting the affirmative defense of sovereign immunity, and they have not done so. Indeed, in its June 13, 2007 Opinion, (Docket Item 33), the Court noted that Mr. Williams' Complaint raised important Eleventh Amendment questions, effectively putting the state on notice as to its potential sovereign immunity defense, and the defendants nonetheless failed to assert the defense. In light of the fact that the state defendants had the burden of proving their entitlement to sovereign immunity, and that "Eleventh Amendment immunity can be ... forfeited through non-assertion," *Christy*, 54 F.3d at 1144, the State would appear to have waived any defense of sovereign immunity that it might have raised in this case.

10. The Individual Defendants also argue that even if such claims were cognizable under Title II of the ADA, they would be entitled to qualified immunity. Because the Court agrees with the Individual Defendants that they cannot be held liable in their individual capacities, the parties' arguments regarding whether the defendants are entitled to qualified immunity are moot. *See In re Montgomery County*, 215 F.3d 367, 373 (3d Cir.2000) (noting that "the doctrine of qualified immunity protects a public official from liability for money damages in her individual capacity only") (citation omitted).

does not provide a cause of action against government employees in their individual capacities, and will grant the Individual Defendants' motion for summary judgment as to Plaintiff's against them. Title II prohibits public entities from discriminating against an individual based on his or her disability, and defines a "public entity" as "any state or local government, ... any department, agency, special purpose district, or other instrumentality of a State or States or local government," and public railroads. 42 U.S.C.A. § 12131(1). On its face, the statutory definition of "public entity" does not extend to individual governmental employees.

Nearly every court that has addressed the question appears to have held that Title II does not authorize suits against government officers in their individual capacities. *See, e.g., Doe v. Division of Youth and Family Services,* 148 F.Supp.2d 462, 489 (D.N.J.2001) ("There is no reference anywhere in Title II to individual liability for violation of the act"); *Calloway v. Boro of Glassboro Dept. of Police,* 89 F.Supp.2d 543, 557 (D.N.J.2000) (citing numerous cases for the proposition that "the weight of judicial authority supports my conclusion that individual defendants cannot be held liable for violations of Title II of the Disability Act"); *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) ("neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials"); *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1005 n. 8 (8th Cir.1999) (en banc) (finding that the term "public entity," as defined in section 12131(1), "does not include individuals"); *Montez v. Romer,* 32 F.Supp.2d 1235, 1240

(D.Colo.1999); *Yeskey v. Pennsylvania,* 76 F.Supp.2d 572, 575 (M.D.Pa.1999).[11] While the Court of Appeals for the Third Circuit has not squarely addressed the question of individual liability under Title II of the ADA, it has held that there is no individual liability under Title III, and, in so holding, noted that "this result comports with decisions of other courts of appeals holding that individuals are not liable under Titles I and II of the ADA, which prohibit discrimination by employers and public entities respectively." *Emerson,* 296 F.3d at 189 (citing, *inter alia, Garcia,* 280 F.3d 98 at 107).

The Court finds this authority persuasive, and accordingly holds that Plaintiff's claims against the Individual Defendants are unsustainable as a matter of law. The Individual Defendants' motion for summary judgment will thus be granted.

### E. Compensatory and Punitive Damages

Finally, the Court addresses Defendants' motion for summary judgment as to Plaintiff's claims for punitive and compensatory damages. Defendants cite *Gagliardo v. Connaught Laboratories, Inc.* for the proposition that punitive damages are available under the ADA only where "the complaining party demonstrates that the respondent engaged in a discriminatory practice with malice or with reckless indifference." 311 F.3d 565, 573 (3d Cir.2002) (citation omitted). According to Defendants, there is no evidence of such reckless indifference on the part of the defendants in the record of this case—to the contrary, they argue, Plaintiff had access to the programs and services at SWSP through the provision of qualified interpreter ser-

---

**11.** *But see Key v. Grayson,* 179 F.3d 996 (6th Cir.1999) (holding that prison officials were entitled to qualified immunity in lawsuit brought against them under Title II without addressing the question of whether officers could be sued in their individual capacities under Title II).

vices. (Def.'s Br. 26–27.) Defendants similarly argue that Plaintiff is not entitled to compensatory damages under the ADA, because in order to recover compensatory damages under Title II, a plaintiff must establish purposeful discrimination, which is not evident in the record here. (*Id.* at 25.)

Plaintiff argues that Defendants' motion as to both punitive and compensatory damages should be denied. Plaintiff argues that, in light of his status as a sexual offender, Defendants' failure to provide suitable access to SWSP's behavior modification program was "egregious in the extreme." (Pl.'s Opp'n Br. 13.) Plaintiff argues that Defendants' deliberate indifference is further exhibited by Defendants' failure to make an interpreter available to Plaintiff during certain medical appointments, and by Defendants' explanation that it could not afford to pay for interpreters, which Plaintiff characterizes as a "deliberately indifferent position." (*Id.*) Finally, Plaintiff argues that "discovery— which is now incomplete—will likely further support Mr. Williams' compensatory and punitive damages claims." (*Id.*)

■ The Court will grant Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages, because punitive damages are not available under Title II of the ADA as a matter of law. The Supreme Court held in *Barnes v. Gorman* that "punitive damages may not be awarded in private suits brought under . . . § 202 of the ADA." 536 U.S. 181, 189, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). The "reckless indifference" standard for

punitive damages utilized in *Gagliardo* and cited by Defendants was employed in the context of Title I of the ADA and is not applicable to Mr. Williams' Title II claims. *Gagliardo*, 311 F.3d at 573.

■ The Court will deny Defendants' motion for summary judgment as to Plaintiff's claim for compensatory damages as premature. In general, courts have held that compensatory damages are available to plaintiffs asserting claims under Title II of the ADA, but only where it is shown that the discrimination was intentional. *See, e.g., Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir.2003) ("private individuals may recover compensatory damages under . . . Title II only for intentional discrimination"); *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998) ("compensatory damages are not available under Title II . . . absent a showing of discriminatory intent"). In light of the circumscribed nature of the discovery that has occurred thus far in this case, the Court agrees with Plaintiff that it would be premature to grant Defendants' motion for summary judgment as to Plaintiff's claim for compensatory damages.[12]

## IV. CONCLUSION

For the reasons explained above, the Court will grant in part and deny in part Defendants' motion for summary judgment. Specifically, Defendants' motion for summary judgment as to Plaintiff's claims against the Individual Defendants and as to Plaintiff's claim for punitive damages will be granted, but the remainder of the

---

12. The Court notes, however, that Plaintiff's arguments regarding the extent to which the evidence demonstrates (or will demonstrate) *Defendants' deliberate indifference to the risk* of discrimination are not persuasive. *See Pryor v. National Collegiate Athletic Ass'n.*, 288 F.3d 548, 569 (3d Cir.2002) (citing *Horner v. Kentucky High School Athletic Ass'n*,

206 F.3d 685, 693 n. 4 (6th Cir.2000), in holding that "the 'discriminatory animus test' involves a 'stricter standard' than the deliberate indifference test)." To prevail on his claim for compensatory damages, Plaintiff will have to present evidence of intentional discrimination, not just deliberate indifference.

relief sought in Defendants' motion will be denied. Thus, the only claim that remains for trial is Plaintiff's § 1983 claim against the defendants in their official capacities. The accompanying Order will be entered.

### ORDER

This matter having come before the Court on Defendants' motion for summary judgment [Docket Item 27]; the Court having considered the submissions of the parties in support thereof and opposition thereto; and the arguments presented by the parties at the hearing convened on January 4, 2007; for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS this *16th* day of **June,** 2008 hereby

ORDERED that Defendants' motion for summary judgment shall be and hereby is **GRANTED IN PART AND DENIED IN PART** as follows:

1. The Individual Defendants' motion for summary judgment as to all claims asserted against them is *granted;* and

2. Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages is *granted;* and

3. The remainder of Defendants' motion is *denied.*