**PUBLISH**

**November 13, 2019**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STANLEY CROPP; CATHERINE
CROPP,

     Plaintiffs - Appellants,

v.

LARIMER COUNTY, COLORADO;
KANDI WULFERT, Corporal of Larimer
County Sheriff's Office, in her individual
capacity,

     Defendants - Appellees.

No. 18-1262
(D.C. No. 1:15-CV-02806-JLK)
(D. Colo.)

_____

**PUBLISHED CONCURRENCE AND DISSENT**
_____

**LUCERO**, J., concurring in part and dissenting in part:

Few in our country have been untouched by Alzheimer's disease.  With increased longevity, "dementia has emerged as the central public health epidemic of the industrialized world."  Marshall B. Kapp, Legal Standards for the Medical Diagnosis & Treatment of Dementia, 23 J. Legal Med. 359, 363 (2002) (quoting David Shenk, The Forgetting—Alzheimer's: Portrait of an Epidemic 163 (2001)) (emphasis omitted).  As dementia rates have risen in the general population, so too has dementia become more common in prisons and jails.  See Yelena Yukhvid, Note, Should Elderly Criminals Be Punished for Being Prisoners of the Mind? An Analysis

of Criminals with Alzheimer's Disease, 50 Gonz. L. Rev. 43, 54 (2015). Confronted with law enforcement issues, Alzheimer's patients are frequently frightened and confused, and caring for them presents unique challenges. See id. Failure on the part of law enforcement to consider these special concerns risks harming some of the most vulnerable members of our society.

This case presents precisely such a failing. Stanley Cropp suffers from Alzheimer's disease. On the evening in question he left his home for a nightly walk. He failed to return, as he had been stopped by Fort Collins police officers and taken to the Larimer County Jail. When Catherine Cropp, Mr. Cropp's wife, was advised of his confinement, she rushed to the Jail, where she told officers that her husband suffered from Alzheimer's disease and would need loving and attentive care and direction. To help him complete forms he was required to sign, she asked to sit with her husband and explain the forms to him. Jail staff declined her request. This left Mr. Cropp in jail for the night.

My respected colleagues in the majority affirm the district court's grant of summary judgment in favor of the defendants, concluding that the Cropps failed to demonstrate the County acted with deliberate indifference.[1] (Majority Order & J. 25-26.) I respectfully disagree. I concur with the majority's conclusion regarding Mr. Cropp's claim for injunctive relief, and although I am concerned about the merits of his claim regarding the County's failure to train, on review of the record, I am

---

[1] My colleagues' nonprecedential order and judgment is Cropp v. Larimer County, No. 18-1262 (10th Cir. Nov. 13, 2019) (unpublished).

ultimately persuaded that the record was not adequately developed to the degree necessary to create a material evidentiary dispute on that issue. Therefore, I agree with the majority's conclusion regarding the County's failure to train. Nonetheless, I respectfully dissent from the majority's analysis regarding Mr. Cropp's failure-to-accommodate claim.

In my view, the Cropps have provided sufficient evidence for a reasonable jury to find the County deliberately indifferent. For eleven hours, Jail staff ignored the Cropps' repeated pleas that Mr. Cropp needed an accommodation. They continued to offer the Cropps the same services available to all inmates regardless of disability—this despite Mrs. Cropp's repeated explanation that those services would not be effective. This refusal to consider a variation from the Jail's standard practices violates the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

# I

When he was wrongfully arrested and detained in late December 2013, Mr. Cropp was 61 years old and experienced confusion, disorientation, and memory issues caused by Alzheimer's disease. These symptoms made social interactions and communication particularly challenging for him. Nights were especially hard because he would get tense and could not sleep. To calm himself, he often walked four blocks around his apartment building where he lived with his wife, proceeding in a circle so as not to get lost.

On the evening in question, Mr. Cropp went on his nightly walk around 10:00 p.m. He was stopped by a Fort Collins police officer. After several other officers

arrived at the scene, he was arrested, dragged into a patrol car, and booked into the Larimer County Jail. By that time, he was frightened and battered. He had not taken his nightly prescribed medications, necessary for him to communicate effectively with others and to stabilize his condition. Booked into the Jail, he was confused after the trauma inflicted by the police officers. All of this exacerbated the disorientation Mr. Cropp experiences, which worsens at night, due to Alzheimer's disease.

Notwithstanding his obvious mental state, Mr. Cropp was placed through routine intake. A member of the Jail's pretrial services staff attempted to explain certain paperwork to him but, because of his Alzheimer's condition, he did not understand the forms and declined to sign them. The forms included an appearance-bond form that would have allowed the Jail to release Mr. Cropp on his own recognizance. Because he did not sign the forms, Mr. Cropp was locked into a cold cell, unable to sleep because of frigid air blowing from a vent.

Meanwhile, Mrs. Cropp, having become worried when Mr. Cropp did not return from his walk, proceeded to look for him in case he had become disoriented. In the intervening years, her husband had become dependent on her to complete many routine tasks, such as taking his medications or preparing food. She was especially concerned because she knew how disoriented he could become at night. Just before 11 p.m., she received a call from the Larimer County Sheriff's Department informing her that her husband was in jail. She immediately rushed to provide assistance.

As soon as she arrived, Mrs. Cropp told Jail staff, including Kandi Wulfert, the supervisor on duty, about Mr. Cropp's Alzheimer's disease. Mrs. Cropp spoke with Mr. Cropp by phone, and he told her he was frightened and confused about why he was in jail. When she learned that her husband needed to sign paperwork, she explained his disability to Wulfert. She emphasized that although Mr. Cropp could not understand the forms by reading them, "if you sit down and go over it and say this is what this says, he can understand that." She implored Wulfert to "let [her] sit down next to him so [she] could show him the documents and go over it so he would have true understanding and sign a document that he understood." Mrs. Cropp explained that she "needed to sit down next to him" because she had been working with him since his Alzheimer's symptoms started and knew she could help him understand documents in this manner.

She was told that such in-person communication would violate Jail policy prohibiting contact visits between inmates and family members. <u>In other words, she was told there would be no such accommodation.</u> Although inmates are permitted to meet face-to-face with attorneys in the booking lobby, Wulfert refused to allow the Cropps to meet in person.[2] There was no staffing shortage at the Jail that night. No one claimed Mr. or Mrs. Cropp were dangerous. Instead of seriously considering the

---

[2] Wulfert and a County representative offered conflicting testimony in their depositions regarding whether attorney visits are allowed overnight. The County's representative stated that attorney visits were not allowed from 10:00 p.m. to 5:30 a.m. Wulfert said that policies regarding contact visits were the same during the day and night shifts, and that attorney visits happening overnight would occur in the corner of the lobby. She acknowledged that she had not seen this done.

Cropps' request, Wulfert simply explained that for inmates with cognitive disabilities who are booked overnight, the Jail's practice is to hold the inmate until morning, when counseling staff arrive. Wulfert later admitted that in denying the Cropps' request, she did not consider whether her denial would impose any particular burden on the Jail other than violating the Jail's policies, and she could not think of any burden that an in-person visit would have imposed.

Wulfert did not offer the Cropps any alternative other than that provided to any non-disabled person: use the Jail's visitation booth, where they could see each other through a thick glass wall and communicate using telephones. The County offers the visitation booth to all inmates and family members. Mrs. Cropp declined to use the visitation booth and explained to Wulfert that based on her years of helping her husband, she knew the visitation booth would not allow them to communicate effectively because it "would not be a reasonable way to explain to a man with Alzheimer's a complicated legal document." She later testified that she could not "have explained a legal document to a man with Alzheimer's through a glass with a phone at my ear and him listening with a phone, no. I needed to sit down next to him."

After Wulfert refused to permit the Cropps a contact visit, she allowed Mrs. Cropp to speak with her supervisor, a lieutenant, by phone. By this time, it was approximately 3 a.m. The lieutenant had the authority to permit an exception to the policy banning in-person visits, but Wulfert never asked the lieutenant to consider doing so. The lieutenant told Mrs. Cropp that because Mr. Cropp would not sign the

-6-

appearance-bond form, the Jail would not release him that night and he would remain in custody until a hearing the following afternoon at 1:30 p.m.

The next morning, resigned to not comprehending the forms, Mr. Cropp signed them. He had been detained for approximately eleven hours. Had he been able to understand the forms, he would have been released after an hour or two.

## II

I concur in my colleagues' conclusion that the Cropps lack standing to pursue injunctive relief. (Majority Order & J. 6-7.) The majority correctly details the general standards applicable to the ADA and Rehabilitation Act claims before us. And my colleagues appropriately reject the district court's characterization of the service at issue as access to a physical contact visit. (Id. at 10.) However, I would squarely hold that the Cropps created material disputes of fact on the questions of meaningful access and deliberate indifference.

## A

The ADA and Rehabilitation Act require more than mere "physical access to public entities"; rather, they require "public entities to provide meaningful access to their programs and services." Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1195 (10th Cir. 2007) (quotation omitted). Department of Justice regulations further mandate "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). For inmates with disabilities that affect communication, this means taking "appropriate steps to ensure that communications

with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." § 35.160(a)(1).

As the majority notes, public facilities are not obligated to provide the exact accommodation requested by a disabled individual if they can demonstrate that "another effective means of communication exists." (Majority Order & J. 16 (quoting 28 C.F.R. pt. 35, app. A, § 35.160.)) However, a public facility "shall give primary consideration to the requests of individuals with disabilities." § 35.160(b)(2). The importance of deference to the individual's requested accommodation is echoed in the appendix to the Department of Justice's implementing regulations: "The public entity shall honor the choice of the individual with a disability unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. pt. 35, app. A (quotation and alteration omitted).[3]

The record demonstrates the County failed to afford primary consideration to the Cropps' request for an accommodation. When Mrs. Cropp asked Jail personnel to permit her to sit with Mr. Cropp to explain the documents, Wulfert immediately shut down any prospect of an in-person visit because it violated Jail policy. Wulfert did not investigate whether it would be possible to allow an exception. When on the phone with her supervising lieutenant, who had the authority to permit an exception,

---

[3] Section 35.164 "does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." Id.

-8-

she did not ask the lieutenant to consider one. Wulfert did not take any action whatsoever to consider the Cropps' request. And the County has not produced other evidence showing that the lieutenant or any other employee considered it. At a minimum, the primary consideration owed by a public facility under § 35.160(b)(2) must require some examination of the facility's ability to grant the request.

The County has also failed to carry its burden of demonstrating that the Cropps' requested accommodation "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." § 35.164. Such a decision "must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." Id. The County has not produced a written statement of reasons. Instead, the County relies on the deposition testimony of its representative that security concerns prevent it from altering its policy for any reason, including disability. When asked whether she could think of an undue burden that an in-person visit would have imposed in this case, Wulfert said she could not think of one. This unbending rigidity is unacceptable under § 35.160. See Chisholm v. McManimon, 275 F.3d 315, 327 (3d Cir. 2001) (noting that "general references to 'security' issues . . . not supported by any showing that 'security' in fact is implicated in making available to an inmate at appropriate times the services and aids . . . requested" is insufficient).

Moreover, the Cropps have identified evidence indicating that it would not have been an undue burden for the County to accommodate their request. The County permits attorneys to meet in-person with their clients in the booking lobby adjacent to the area in which Mr. Cropp was being held.[4] And because the Jail was fully staffed that evening, the County could have assigned officers to watch or restrain Mr. Cropp, thereby adding an additional layer of security.

Although the majority notes that it does not need to determine whether the visitation booth would have been effective, it nonetheless points to the visitation booth as "nearly identical" to the in-person visit requested by the Cropps. (Majority Order & J. 20.) But the majority fails to address the key difference between a glass-enclosed visitation booth and an in-person visit: the thick glass wall physically separating the Cropps prevented Mrs. Cropp from sitting next to her husband and assisting him with the form. Given Mrs. Cropp's adamant statements that the visitation booth would not permit her to communicate effectively with Mr. Cropp, this difference cannot be overlooked.

The majority ignores Mrs. Cropp's repeated statements in absolute terms that the visitation booth would not allow her to explain the forms to her husband. She testified: "I don't think I could have explained a legal document to a man with

---

[4] As noted above, two County witnesses gave inconsistent testimony as to whether attorneys were allowed to meet with clients during the night shift. Because this case was decided on summary judgment, we view the facts in the light most favorable to the Cropps as the nonmoving parties. Knopf v. Williams, 884 F.3d 939, 946 (10th Cir. 2018). Therefore, I construe the evidence to show that attorney visits could be permitted in the booking lobby overnight.

Alzheimer's through a glass with a phone at my ear and him listening with a phone, no. I needed to sit down next to him." She stated that she told Jail staff the visitation booth "would not be a reasonable way to explain to a man with Alzheimer's a complicated legal document." She further testified: "I can't do that between—with that glass between us. I cannot do that as well: Do you see this here; this is what it's saying to you. I can't do that." The majority places great weight on Mrs. Cropp's use of "as well", concluding that her repeated, forceful statements that the visitation booth would not have provided effective communication meant only that she understood it not to be <u>as</u> effective as the requested in-person visit. (Majority Order & J. 21-22, n.13.) This characterization ignores her testimony that the visitation booth would not allow Mr. Cropp to understand the form, and therefore, to access a level of communication substantially equal to the communication afforded to other inmates at the Jail.

Rather than offering any affirmative evidence to carry its burden of showing that the visitation booth would have effectively provided access to communication for Mr. Cropp, the County blames Mrs. Cropp for its utter lack of evidence. It asserts that her refusal to use the visitation booth makes it impossible to ascertain whether the booth would have been effective. This argument mistakes Mrs. Cropp's burden. Although a public entity may rely on a person accompanying the individual with disabilities to help with communication, "[t]he public entity may not coerce or attempt to persuade another adult to provide effective communication for the individual with a disability." 28 C.F.R. pt. 35, app. A. The County could not force

-11-

Mrs. Cropp to use the booth, thus her refusal to so participate eliminated the booth as a potential accommodation. Moreover, her refusal does not extinguish the County's burden to show that it offered Mr. Cropp an accommodation that would have been effective.

Forcing inmates with disabilities to use existing services, when their disabilities make "meaningful access" to those services impossible, is exactly the type of discrimination that the ADA and the Rehabilitation Act are designed to prevent. As Congress observed in passing the ADA, "individuals with disabilities continually encounter various forms of discrimination, including . . . failure to make modifications to existing facilities and practices." 42 U.S.C.S. § 12101(a)(5). This is precisely the type of discrimination Mr. Cropp encountered at the Larimer County Jail. I underscore the fact that the County never provided Mr. Cropp with an accommodation. The required means of communication for all inmates wishing to communicate with their families, the thick glass wall and telephone, was not a service or an accommodation. In what amounts to nothing less than a legerdemain, the majority proposes to call the visitation booth an accommodation when it is not an accommodation at all for anyone. It is simply the required means of communication for all inmates. Calling the visitation booth an accommodation is akin to calling the Jail itself an accommodation, open to all, the abled and disabled alike.

Instead of providing an accommodation, the County's standard practice for inmates with cognitive disabilities who cannot understand forms is to hold them overnight until counseling staff arrive in the morning. Under this practice, non-

disabled inmates can avail themselves of immediate release upon signing paperwork, but inmates with disabilities are forced to remain incarcerated. This is no way to treat patients with Alzheimer's. Leaving Mr. Cropp to freeze in a cell overnight because the Jail refused to provide an accommodation, modify its policies, or call in a staff member trained to provide such accommodations is the epitome of the "thoughtlessness and indifference" and "benign neglect" that undergirds discrimination against people with disabilities. Alexander v. Choate, 469 U.S. 287, 295 (1985). I would hold that factual disputes preclude summary judgment on whether the County discharged its obligation to provide Mr. Cropp meaningful access to its services.

**B**

Declining to address meaningful access, the majority holds that no reasonable jury could find the County acted with deliberate indifference. (Majority Order & J. 13.) To demonstrate deliberate indifference, a plaintiff must prove "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1229 (10th Cir. 2009) (quotation and alteration omitted). Deliberate indifference is a higher standard than negligence and requires proof of deliberate action. J.V. ex rel. C.V. v. Albuquerque Pub. Sch., 813 F.3d 1289, 1298 (10th Cir. 2016). The Cropps present two theories to demonstrate deliberate indifference: the County failed to accommodate Mr. Cropp's disability, and the County failed to train its personnel.

**i**

I agree with the majority that it is not per se deliberate indifference for a public facility to refuse to provide a requested accommodation. (Majority Order & J. 16-18.) That rule, however, does not excuse the County's inaction in this case. When the County denied the Cropps an in-person visit, it was on notice that: (1) Mr. Cropp had Alzheimer's disease, which made it impossible for him to comprehend the form on his own; (2) his wife and caretaker believed he could comprehend the form if she was able to sit with him to explain it; and (3) she could not explain the form to him through the visitation booth's glass window, and would not attempt to do so. Based on the information about Mr. Cropp's disability that Mrs. Cropp provided, harm to Mr. Cropp's ADA and Rehabilitation Act rights without accommodation was not just "substantially likely," it was virtually certain.

Armed with this knowledge, the County did essentially nothing. The majority concludes that the County could not have known that it was substantially likely that the booth would be ineffective because it considers in-person visits and the visitation booth to be physically similar. (Majority Order & J. 20-22.) It also discounts Mrs. Cropp's repeated insistence that the visitation booth would not be an effective accommodation. (Id.) Although it is correct that Mrs. Cropp may have initially offered to explain the forms to Mr. Cropp utilizing the thick glass separation available, upon realizing that this was something she could not do, she told Jail officials so. Their response was effectively take it or leave it. The County should have offered an effective means of communication. It did not do so.

The County took no further action to accommodate Mr. Cropp. It did not modify or consider modifying any of its existing services to accommodate him. Wulfert's lieutenant had the authority to order an exception to the Jail's policy on in-person visitation or to provide another modification or accommodation to allow Mr. Cropp access to the form, but took no action. See Updike v. Multnomah Cty., 870 F.3d 939, 954 (9th Cir. 2017) ("A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference.").[5] From intake to release, the Jail applied the same policies to Mr. Cropp that it applies to non-disabled inmates, without considering whether they would effectively accommodate Mr. Cropp's disability. This is a profound failure to act. I would conclude that the Cropps have provided adequate evidence of deliberate indifference for a reasonable jury to rule in their favor.[6]

---

[5] The majority states that the Cropps did not argue the County was deliberately indifferent in refusing an in-person visit without investigating whether the County could provide such a visit to Mr. Cropp. (Majority Order & J. 15 n.10.) To the contrary, the Cropps have repeatedly argued that the County intentionally and summarily denied their request without the required "primary consideration," § 35.160(b)(2), standing instead on its absolute policy that the provided visitation booth had to be utilized.

[6] Both the district court and the majority reject Mrs. Cropp's associational claims as dependent upon Mr. Cropp's claims. (Majority Order & J. 26-27.) Because I would reverse the district court's grant of summary judgment on Mr. Cropp's failure-to-accommodate claim, I would remand Mrs. Cropp's associational claims for further consideration by the district court in the first instance.

**ii**

On the Cropps' failure-to-train claim, the majority concludes that the Cropps did not provide adequate evidence to show the County "was on notice of the need for more or better training." (Majority Order & J. 24 (citing <u>J.V.</u>, 813 F.3d at 1298).) I agree with my colleagues that the Cropps' evidence that the Department of Justice was investigating the County for failing to accommodate deaf individuals was ultimately insufficient to put the County on notice absent further information connecting the investigation to Mr. Cropp's experience. However, there is substantial evidence in the record showing that Jail personnel's failure to accommodate Mr. Cropp by rigidly adhering to policy perfectly accorded with the County's training. Moreover, none of the County's employees were able to identify any training they received regarding accommodating inmates with Alzheimer's disease. This is disturbing. Although the majority allows the County to escape liability today, its personnel desperately need training on how to accommodate this vulnerable population.

**III**

A reasonable jury could conclude that the County deprived Mr. Cropp of meaningful access to its services and, in doing so, acted with deliberate indifference to the strong likelihood that his federally protected rights were violated. Accordingly, I would reverse that part of the district court's grant of summary judgment and remand for further proceedings. As things stand, tonight another Alzheimer's patient somewhere in the six states of our circuit may be similarly

-16-

treated.  We should not allow this kind of indifference to those suffering from Alzheimer's to persist.  If law enforcement officers propose to arrest Alzheimer's patients for the simple act of walking around the block, then jail personnel had best be prepared to accommodate the disabilities of those patients when clearly advised of the patients' condition.  I respectfully dissent.